PRESENT: All the Justices

HORACE E. PERDIEU, AS ADMINISTRATOR
 OF THE ESTATE OF LUCILLE P. OVERTON,
 DECEASED

                                        OPINION BY
v.  Record No. 012008          JUSTICE DONALD W. LEMONS
                                     September 13, 2002
BLACKSTONE FAMILY PRACTICE CENTER,
 INC., ET AL.


           FROM THE CIRCUIT COURT OF NOTTOWAY COUNTY
                     James A. Luke, Judge

     In this appeal, we consider whether the trial court erred

in refusing to qualify three of the plaintiff's proposed expert

witnesses.  We further consider whether the trial court erred in

granting the defendants' motions to strike at the conclusion of

the plaintiff's case-in-chief when the plaintiff did not present

essential expert testimony.

                I. Facts and Proceedings Below

     According to well-settled principles of appellate review,

when the evidence has been struck at the conclusion of the

plaintiff's case-in-chief, we will recite the facts in the light

most favorable to the plaintiff.  Bryan v. Burt, 254 Va. 28, 30-

31, 486 S.E.2d 536, 537 (1997).

     On January 4, 1995, Lucille P. Overton ("Overton") was

admitted as a patient to Heritage Hall Health Care ("Heritage

Hall"), a nursing home facility in Blackstone, Virginia.  Upon

her admission, she entered into an agreement entitled "Heritage

Hall Admission Agreement" (the "contract"), in which HCMF Corporation ("HCMF"), t/a Heritage Hall Health Care, agreed to provide Overton with such care as her condition reasonably required. Overton had a history of "mental confusion, dementia and disorientation." Charles I. Rosenbaum, M.D. ("Dr. Rosenbaum") and Blackstone Family Practice Center, Inc. ("BFPC") were listed on Overton's chart as her medical care providers. The Heritage Hall staff performed an evaluation of Overton's condition and needs upon her arrival to the facility, which indicated that Overton was "ambulatory only with assistance, was confused, and only sometimes oriented to place and time." As a result of the evaluation, the Heritage Hall staff categorized Overton as subject to a high risk for falls.

On January 20, 1995, Overton fell from her bed onto the floor of her room. A member of the staff at Heritage Hall contacted BFPC and Dr. Rosenbaum to inform them of Overton's fall. Overton was then examined by Dr. Josephine R. Fowler ("Dr. Fowler"), a resident physician in training at the Medical College of Virginia/Virginia Commonwealth University, who was conducting a family practice rotation under the supervision of BFPC. Dr. Fowler did not diagnose any injuries resulting from Overton's fall.

The next day, January 21, 1995, Overton fell again, this time in the dining room at Heritage Hall. Again, Dr. Fowler

examined Overton and did not diagnose any injury resulting from the fall.

After the second fall, Overton's physical and psychological condition "severely deteriorated."  Overton's son, Horace E. Perdieu ("Perdieu"), visited her on January 30 or 31, 1995, observed her condition, and requested medical attention for his mother from the Heritage Hall staff.  The staff notified BFPC, and as a result Overton was examined by Dr. George P. Damewood ("Dr. Damewood"), another resident physician associated with BFPC.  During a physical examination, Dr. Damewood determined that Overton appeared to have sustained a hip fracture and he ordered x-rays of Overton's hip.  Dr. Rosenbaum viewed the x-rays and confirmed the hip fracture and Dr. Barry W. Burkhardt ("Dr. Burkhardt") subsequently performed surgery on Overton to replace her fractured hip with a prosthesis.

On April 30, 1999, Overton filed a four-count motion for judgment against BFPC, Dr. Rosenbaum, and HCMF, seeking one million dollars in "compensatory and exemplary damages."  In Count I, Overton alleged that HCMF breached its contract with her when it failed to provide her with reasonable care, failed to direct the development of a suitable care plan related to her personal health needs, and failed to protect her with adequate safety measures.

3

In Count II, Overton alleged that BFPC and Dr. Rosenbaum committed medical malpractice because Dr. Rosenbaum failed to personally examine Overton and allowed her to be examined by Dr. Fowler, a "completely unsupervised" resident physician.  Overton further alleged that BFPC and Dr. Rosenbaum failed to properly "examine, diagnose, and treat" her, in violation of the applicable standard of reasonable care, and failed to implement adequate safety measures to prevent her from falling.

In Count III, Overton alleged that all three defendants engaged in "negligent and careless acts and omissions" when they failed to "properly attend, restrain, assist, examine, diagnose and treat" her.  She further alleged that the three defendants "negligently failed to supervise their employees."

Finally, in Count IV, Overton alleged that HCMF violated Code § 32.1-138, which enumerates certain requirements for nursing homes in Virginia, and that HCMF, Dr. Rosenbaum, and BFPC violated 42 U.S.C. § 1395i-3, which provides requirements for "skilled nursing facilities."

Overton died of unrelated causes on October 16, 1999, and Perdieu qualified as the administrator of her estate.  On March 7, 2000, Perdieu, as Administrator of the Estate of Lucille P. Overton, was substituted as the plaintiff in the case.

Prior to trial, Perdieu designated eight experts, including the three at issue in this appeal: Dr. John O. Martin ("Dr.

4

Martin"), Dr. Reinald Leidelmeyer ("Dr. Leidelmeyer"), and Phylis Corrigan, R.N. ("Corrigan"). Dr. Martin proposed to testify that the lack of a suitable care plan and safety measures in place to prevent Overton's falls violated the appropriate standard of care. He would have opined that this failure directly and proximately caused Overton's physical injury and continued pain and suffering.

Dr. Leidelmeyer was designated to testify about the same matters as Dr. Martin, and was further designated to testify that Overton's medical records, including the records of Dr. Fowler's examinations, were "not sufficiently detailed." As a result of Dr. Fowler's "grossly inadequate records" and her failure to report the falls, as required, Dr. Leidelmeyer would have testified that it took approximately ten or more days to diagnose Overton's hip fracture. Dr. Leidelmeyer would also have testified that Dr. Rosenbaum's conduct, in failing to consult with Dr. Fowler, "consitute[d] a serious aberration of accepted standards and protocol of resident physician training programs."

Corrigan was designated to testify "as to the standard of care which [Overton] should have received" from HCMF. Corrigan would have opined that proper care, which was "reasonably necessary to prevent the falls and resulting injury" sustained by Overton, was not provided. Corrigan would further have

5

testified that a patient-specific care plan should have been instituted immediately upon Overton's admission to Heritage Hall.

Dr. Rosenbaum and BFPC filed motions in limine to exclude the testimony of Dr. Leidelmeyer and Dr. Martin. HCMF filed a similar motion in limine to exclude the testimony of Dr. Martin and Corrigan. On the day before trial, the court heard arguments on the motions to exclude the various expert witnesses. The court first considered the qualifications of Dr. Leidelmeyer and viewed a videotape of his deposition. Dr. Leidelmeyer testified that he had served as the head of the emergency department of medicine at Fairfax Hospital in Fairfax, Virginia, from approximately 1961 until 1982. While at Fairfax Hospital, Dr. Leidelmeyer was in a "supervisory capacity over all the physicians," including interns and residents in training. After leaving that position, he "opened a walk-in clinic for primary care," and operated the clinic for "[a]bout ten years," until approximately 1992. Dr. Leidelmeyer testified that after leaving his employment with the "walk-in clinic," he worked approximately one day per week for a private family practice clinic owned by two doctors who had previously worked for him at Fairfax Hospital. He held this employment until 1998. Dr. Leidelmeyer testified that from 1990 until 2001, he also worked approximately one day per week at the Fairfax County

6

Health Department ("Health Department"), where he performed pre-employment physicals and interpreted tuberculosis tests.  He testified that he did not diagnose or treat fractures, nor did he treat nursing home patients, while working at the Health Department.

BFPC and Dr. Rosenbaum argued that Dr. Leidelmeyer did not satisfy the requirements of Code § 8.01-581.20 because his part-time employment at the Health Department did not qualify as an "active clinical practice," as required by the statute.  They argued that Dr. Leidelmeyer "was not treating patients therefore he was not actually a clinician at that point."  Furthermore, BFPC and Dr. Rosenbaum maintained that Dr. Leidelmeyer did not practice in the same specialty as Dr. Rosenbaum, who was a family practice physician.  They argued that Dr. Leidelmeyer was not diagnosing and treating fractures, was not treating nursing home patients, and was not supervising interns or residents within a year of the alleged malpractice, which occurred in 1995.  Accordingly, BFPC and Dr. Rosenbaum maintained that Dr. Leidelmeyer could not qualify as an expert pursuant to Code § 8.01-581.20.

Perdieu argued that Dr. Leidelmeyer satisfied the requirements of Code § 8.01-581.20.  He emphasized Dr. Leidelmeyer's testimony "that he's been engaged in the clinical practice of primary care which treats all members of the

7

family."  Perdieu argued that the statute did not address how many work days each week were required to constitute a "clinical practice," and he maintained that Dr. Leidelmeyer's employment at the Health Department satisfied the statutory requirements.

The trial court ruled that Dr. Leidelmeyer could not testify as an expert witness, observing:

> [T]here's a very great question as to whether he has any clinical practice during the period of time [required by Code § 8.01-581.20].  He worked for this health department, he filled in a day a week, he says, for a couple of doctors. . . .
>     The [court is] of the opinion that he did not have a clinical practice and I might add he never had any, testifies to no experience treating and diagnosing fractures.  He must have seen some in his practice, but I don't hear much from him about that.  I can't allow his testimony. . . .

The trial court next considered Corrigan's qualifications and viewed a videotape of her deposition, wherein Corrigan discussed her work experience.  She testified that while working in a hospital from 1991 to 1997, her "area of expertise was dealing with primarily elderly, critical patients who came in from either home or . . . from nursing homes . . . because of an acute problem."  Corrigan further testified that she assisted the hospital social worker in providing nursing homes with information they would need to care for the patient after his or her release from the hospital, and she prepared discharge

summaries for patients moving to nursing homes. All of Corrigan's nursing experience was "hospital based."

HCMF argued that Corrigan did not qualify as an expert witness pursuant to Code § 8.01-581.20, because her only experience was in an acute-care setting and she had never worked in a nursing home or long-term care facility. Accordingly, HCMF maintained that Corrigan did not work in a field of medicine "related" to the defendant's field, as required by the statute. HCMF further argued that Corrigan had never devised a care plan in a long-term care facility, and she had never made decisions regarding the use of restraints in a nursing home, which was one of the issues to which she proposed to testify. Finally, HCMF asserted that the standard of care in a nursing home is different from the standard of care in a hospital. For these reasons, HCMF maintained that Corrigan failed to qualify as an expert witness pursuant to Code § 8.01-581.20.

Perdieu argued that Corrigan was qualified as an expert witness based on her experience working with elderly patients as a nurse and formulating care plans for them. He further argued that Corrigan worked with nursing home patients while they were in the hospital and he emphasized that her experience included transferring patients to nursing homes with the necessary documentation and care instructions.

The trial court ruled that Corrigan was not qualified to testify as an expert witness.  The court explained: "I can't see that she has any experience in this specific field which is caring for patients in a nursing home and I don't think she's qualified to testify."

Perdieu called Dr. Martin as a witness at trial.  Dr. Martin testified that he was a licensed physician in Virginia from 1956 until 2000.  He explained that since 1987, his work in the medical field consisted of serving as the "medical officer" for a senior citizen softball league.  Dr. Martin testified that during his years of practice, he worked in the field of general practice and he "treated quite a few fractures"; furthermore, he also treated patients in nursing homes.  On cross-examination, Dr. Martin testified that he retired from treating patients on a "regular, full time basis" in 1987, and that he had not worked in a nursing home since 1965.

Dr. Rosenbaum, BFPC, and HCMF argued that Dr. Martin did not qualify as an expert witness because he had been retired since 1987, he did not have an active clinical practice at the relevant time period as required by Code § 8.01-581.20, and he did not have knowledge of the standard of care in a nursing

home.[1]  Perdieu maintained that Dr. Martin was qualified pursuant to Code § 8.01-581.20, based on his "long-standing qualifications in the general practice of medicine."

The trial court refused to qualify Dr. Martin as an expert witness.  The court explained:

> The question here is whether Dr. Martin can be qualified as an expert in the defendant's specialty.  Dr. Martin testifies to having been a [general practice physician] and still is without an active clinical practice. . . .
>
> ****
>
> The [c]ourt cannot qualify Dr. Martin . . . to offer an opinion as to the standard of care involved in this case, the standard of care for treatment of geriatric patients in a nursing home for he's never done it except perhaps a year back in the '60s and that won't do in this case.  I cannot let him testify.

Perdieu presented the expert testimony of Dr. Burkhardt, the surgeon who performed Overton's bipolar hip prosthesis.  Dr. Burkhardt testified by audio-visual deposition that while performing Overton's surgery, he discovered dark fluid in the capsule around her hip joint.  According to Dr. Burkhardt, the presence of dark fluid "was a clear indication that it was an older fracture."  He estimated that the fracture was 10 to 14 days old.

---

[1] Dr. Martin testified that his definition of the standard of care was "to do the best care that's available to give that patient."

11

At the conclusion of Perdieu's case-in-chief, Dr. Rosenbaum, BFPC, and HCMF each moved to strike the evidence. Dr. Rosenbaum and BFPC argued that in a medical malpractice case, the plaintiff is required to use expert testimony to establish the standard of care, a breach of the standard of care, and causation. They maintained that Perdieu failed to present expert testimony on these three required elements.

HCMF joined Dr. Rosenbaum's and BFPC's motion to strike the evidence and further argued that in order to establish proximate cause, pursuant to Bryan v. Burt, 254 Va. 28, 486 S.E.2d 536 (1997), Perdieu was required to state "what should have been done." HCMF maintained that Perdieu failed to present any evidence as to what measures should have been taken to prevent Overton's falls. Furthermore, HCMF noted the absence of evidence that any deviation from the standard of care caused Overton's falls, and the lack of evidence that Overton's falls caused her fracture.

Perdieu argued that jurors are able to make judgments on matters within their common knowledge without the need for expert testimony. He asserted that the lack of safety precautions in place, Overton's two separate falls, the lack of supervision over Dr. Fowler, the failure to diagnose the fracture, and Overton's deteriorating health following the falls were all facts and circumstances within the common knowledge and

12

understanding of jurors.  Accordingly, he maintained that expert testimony was not required and that the defendants "just missed [the fracture], and it's up to the jury to determine whether or not [the defendants] should have exercised the standard of care necessary to detect [the fracture]."

The trial court granted both motions to strike, and explained:

> I don't think there is any question in this case but that Mrs. Overton's hip was broken while she was a patient at Heritage Hall.  I don't think there's any question . . . that her condition deteriorated some and I quite understand the upset to anyone closely associated with her.  I also don't think there is any question [that] it is necessary in this case for the plaintiff to be able to show a breach of the standard of care and I think that can only be done through expert testimony, which as I've said, was not able to be produced.
> . . . The [c]ourt has no choice in this matter but to grant both motions to strike.

On June 8, 2001, the trial court entered its final judgment order from which Perdieu appeals.

On appeal, Perdieu argues that the trial court erred in refusing to qualify Dr. Leidelmeyer, Dr. Martin, and Corrigan as expert witnesses.  Perdieu maintains that the trial court misinterpreted Code § 8.01-581.20 because the statute is not exclusionary, but is only intended to give guidance as to when an expert shall be qualified to testify.  He asserts that experts can qualify even if they do not specifically meet all of

the criteria enumerated in the statute.  Nevertheless, Perdieu maintains that the three excluded experts were qualified to testify, even pursuant to the trial court's interpretation of the statute.  Perdieu further argues that the trial court erred in striking the evidence at the conclusion of his case-in-chief. He maintains that the negligence at issue in the case was "so blatant" that the determination of a violation of the standard of care was within the common knowledge of the jury. Accordingly, he asserts that expert testimony was not required.

Dr. Rosenbaum, BFPC, and HCMF argue that the trial court properly interpreted the requirements of Code § 8.01-581.20 to determine that Dr. Leidelmeyer, Dr. Martin, and Corrigan were not qualified to testify as experts pursuant to the statute. They further argue that expert testimony was required in this case to establish the standard of care, a breach, and causation. Because Perdieu failed to present expert testimony on each of the required elements, they maintain that the trial court properly granted their motions to strike Perdieu's evidence at the conclusion of his case-in-chief.

## II. Standard of Review

The question whether a witness is qualified to testify as an expert is "largely within the sound discretion of the trial court."  Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979) (citing Swersky v. Higgins, 194 Va. 983, 985, 76 S.E.2d

14

200, 202 (1953)).  In the context of a medical malpractice action, this determination must be made with reference to Code § 8.01-581.20.  "A decision to exclude a proffered expert opinion will be reversed on appeal only when it appears clearly that the witness was qualified."  Noll, 219 Va. at 800, 250 S.E.2d at 744, (citing Landis v. Commonwealth, 218 Va. 797, 800, 241 S.E.2d 749, 751 (1978)).

When a defendant challenges the sufficiency of a plaintiff's evidence by a motion to strike, "the trial court should resolve any reasonable doubt as to the sufficiency of the evidence in plaintiff's favor and should grant the motion only when 'it is conclusively apparent that plaintiff has proven no cause of action against defendant.' "  Williams v. Vaughan, 214 Va. 307, 309, 199 S.E.2d 515, 517 (1973) (quoting Leath v. Richmond, F. & P. R.R., 162 Va. 705, 710, 174 S.E. 678, 680 (1934)).

## III. Analysis

Perdieu first argues that the trial court misinterpreted Code § 8.01-581.20 when it refused to qualify three of his proposed expert witnesses.  Perdieu maintains that the word "shall" included in the statute is not exclusionary; instead, he argues that the statute is meant to provide guidance and general requirements to the trial court, which, if met, will generally qualify an expert to testify.  He asserts that proposed experts

15

are not required to satisfy the statutory criteria in order to qualify as expert witnesses. However, we have previously held that the requirements of Code § 8.01-581.20 are mandatory. See Fairfax Hosp. Sys., Inc. v. Curtis, 249 Va. 531, 536, 457 S.E.2d 66, 70 (1995) (holding that a trial court properly excluded a proposed expert when "he failed to maintain an active clinical practice in [the relevant] field of medicine or a related field within one year of the date of the alleged medical malpractice as required by Code § 8.01-581.20").

Perdieu next argues that his three proposed expert witnesses were qualified to testify pursuant to Code § 8.01-581.20. Code § 8.01-581.20(A) provides, in pertinent part:

> A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

The trial court stated its reason for excluding each of Perdieu's three proposed experts. The court excluded Dr. Leidelmeyer because he did not have an active clinical practice within a year of the alleged malpractice. The court excluded Corrigan because she did not have experience in the relevant field of nursing home care. Finally, the court excluded Dr.

16

Martin because he did not have an active clinical practice during the relevant time period, and because he had not treated nursing home patients for over 30 years.

We have held that the purpose of the requirements in Code § 8.01-581.20 is "to prevent testimony by an individual who has not recently engaged in the actual performance of the procedures at issue in a case."  Sami v. Varn, 260 Va. 280, 285, 535 S.E.2d 172, 175 (2000).  In light of the record, the statute's purpose and the trial court's stated reasons for refusing to qualify the three proposed experts, we cannot say that the trial court abused its discretion in disqualifying any of the three proposed expert witnesses.

This medical malpractice action involved Dr. Rosenbaum's treatment of nursing home patients, which included the diagnosing of fractures.  During the relevant time period, Dr. Leidelmeyer was working one day per week in a private clinic and one day per week at the Health Department, where he did not treat fractures or work with nursing home patients.  Dr. Martin retired in 1987, and during the relevant time period, he was volunteering as the "medical officer" for a senior citizen softball league.  He did not testify to treating any fractures or nursing home patients during the relevant time period. Finally, although Corrigan demonstrated some experience working with nursing home patients in hospitals, the entirety of her

17

experience involved treatment in an acute-care setting. Neither Dr. Leidelmeyer, Corrigan, nor Dr. Martin had "recently engaged in the actual performance of the procedures at issue" in the case. Id. Accordingly, the trial court did not abuse its discretion in refusing to qualify these proposed experts.

Finally, Perdieu asserts that the trial court erred in striking the evidence at the conclusion of his case-in-chief. He maintains that the issues involved in the case were within the common knowledge and understanding of the jury; therefore, expert testimony was not required to establish the standard of care, a breach, or causation.

In Raines v. Lutz, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986), we recognized that "expert testimony is ordinarily necessary to establish the appropriate standard of care, to establish a deviation from the standard, and to establish that such a deviation was the proximate cause of the claimed damages." See also Rogers v. Marrow, 243 Va. 162, 167, 413 S.E.2d 344, 346 (1992). Perdieu argues that this case falls within the exception recognized in Beverly Enterprises-Virginia, Inc. v. Nichols, 247 Va. 264, 267, 441 S.E.2d 1, 3 (1994), wherein we held that "[i]n certain rare instances . . . expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience."

Beverly Enterprises involved a medical malpractice action wherein we considered whether the plaintiff was required to present expert testimony to prove the defendant's negligence. Blanche Nichols ("Nichols") was a resident in a nursing home, and the nursing home staff was aware that Nichols had previously choked on food and was unable to eat without assistance. Id. at 266, 441 S.E.2d at 2. Nevertheless, an employee of the nursing home delivered a tray of food to Nichols, who then attempted to feed herself without assistance, choked on a piece of food, and died of asphyxia. Id. at 266-67, 441 S.E.2d at 2. At trial, a licensed practical nurse employed by the nursing home testified that if someone left a tray of food in Nichols' room, "that 'would have been a mistake.' " Id. at 267, 441 S.E.2d at 2. The plaintiff did not present expert testimony on the standard of care and the jury found for the plaintiff. Id. at 265, 441 S.E.2d at 2.

Based on the unique facts of the case, we held that the evidence was sufficient to support the jury's finding of negligence without the aid of expert testimony on the standard of care. Beverly Enterprises, 247 Va. at 268, 441 S.E.2d at 3. The defendant knew of Nichols' physical condition and her prior choking incidents, and despite this knowledge, the defendant's employee left a tray of food in front of Nichols and failed to provide her with the required assistance. Id. We held: "[T]he

19

question whether a reasonably prudent nursing home would permit its employees to leave a tray of food with an unattended patient who had a history of choking and who was unable to eat without assistance is certainly within the common knowledge and experience of a jury." Id. at 269, 441 S.E.2d at 4.

The negligence alleged in the present case is of a different nature than the negligence involved in Beverly Enterprises. Perdieu advanced two separate theories of negligence against Dr. Rosenbaum and BFPC. First, he alleged that both were negligent when they failed to timely diagnose Overton's hip fracture. The issue whether a fracture was diagnosed in a timely manner is a medical issue not within the common knowledge and experience of a jury. Therefore, expert testimony was required to establish the relevant standard of care, a breach, and causation, and Perdieu failed to present this required testimony. Although he presented expert testimony through Dr. Burkhardt, who testified that Overton's fracture was sustained approximately 10 to 14 days prior to the diagnosis, no evidence was presented that the fracture could have been diagnosed earlier, or that a delay in diagnosis constituted a breach of the standard of care. Furthermore, Perdieu presented no expert testimony that any breach by Dr. Rosenbaum or BFPC caused the claimed damages.

Perdieu also alleged that Dr. Rosenbaum and BFPC were negligent in failing to properly supervise Dr. Fowler, a resident physician.  The issue whether a resident physician was appropriately supervised is not within the common knowledge of a jury; therefore, expert testimony was required to establish the standard of care for supervising resident physicians and this required expert testimony was not presented.  Taking the evidence in the light most favorable to Perdieu, as we must, we hold that Perdieu failed to present required expert testimony on the elements of the standard of care, breach, and causation, with respect to either of the theories of negligence against Dr. Rosenbaum and BFPC.  Accordingly, the trial court did not err in granting Dr. Rosenbaum's and BFPC's motion to strike the evidence because it was "conclusively apparent" that Perdieu had not proven a cause of action against them.  Williams, 214 Va. at 309, 199 S.E.2d at 517.

Perdieu also advanced two theories of negligence against HCMF.  First, he alleged that HCMF was negligent in failing to implement a care plan that would have prevented Overton's falls. Perdieu conceded during oral argument that he did not present evidence of causation at trial.  Specifically, he failed to present evidence that any specific care plan would have prevented Overton's falls.  Furthermore, the appropriate standard of care required by a nursing home to prevent falls by

21

residents is not within the common knowledge or understanding of a jury. Therefore, Perdieu was required to present expert testimony to establish the relevant standard of care, a breach by HCMF, and causation. He failed to meet this burden.

Perdieu further alleged that HCMF was negligent in failing "to adhere to applicable standards of care . . . when [it] failed to properly attend, restrain, assist, examine, diagnose and treat" Overton, which "evince[d] a conscious disregard for [her] well-being." The appropriate standard of care for treating nursing home residents is not within the common knowledge of the jury; therefore, expert testimony was again required to establish the standard of care.[2] Perdieu failed to present expert testimony on the standard of care, a breach, or causation. Again, viewing the evidence in the light most favorable to Perdieu, we hold that the trial court did not err in granting HCMF's motion to strike the evidence because without the required testimony, Perdieu had not proven a cause of action against HCMF. Id.

In summary, the trial court did not abuse its discretion in excluding the testimony of the proposed expert witnesses, and the trial court did not err in striking the plaintiff's

---

[2] Furthermore, the record establishes that HCMF notified BFPC after each of Overton's falls, and on each occasion, Overton was examined by a physician.

evidence.  Accordingly, the judgment of the trial court will be affirmed.

<u>Affirmed</u>.