# CIRCUIT COURT OF THE CITY OF ROANOKE

Carolyn W. Hartman

v.

Laurence I. Kleiner
and Weaver & Weaver, P.C.

November 2, 2005

Case No. CL02-549

BY JUDGE CHARLES N. DORSEY

This case is before the Court on defendants' pretrial Motion *in Limine* to exclude Dr. Isabelle Richmond, M.D., from testifying as an expert.

*I. Facts and Procedural Disposition*

This medical malpractice action arises from a surgery performed on Carolyn W. Hartman on June 5, 2000, by Dr. Laurence Kleiner, M.D., then employed by Weaver & Weaver, P.C. ("Weaver"). The purpose of the surgery was to remove a cavernous hemangioma ("CH") from Hartman's brain, which has been defined as a "reddish-blue mass composed of a framework of connective tissue containing large blood-filled spaces," 1-C-CG *Attorney's Dictionary of Med.* 2646 (2000), or a "benign tumor of dilated blood vessels." *Taber's Cyclopedic Med. Dictionary* 863 (18th ed. 1997) (defining "hemangioma). Following the surgery, Hartman developed paralysis in her face, arm, and leg.

Ms. Hartman subsequently filed a Motion for Judgment alleging Dr. Kleiner and Weaver, as his employer, were negligent in failing to:

> (1) Inform or advise her of the risks and complications involved in the surgical procedure;
> (2) Obtain complete and accurate informed consent from her;
> (3) Advise her of other options for treating her condition; and
> (4) Employ a reasonable amount of attention and skill in examining, diagnosing, and treating her.

*See* Pl.'s Mot. J. at 2-3.

Hartman intends to use the expert testimony of Dr. Isabelle Richmond, M.D., at trial. Preemptively, Kleiner and Weaver move to exclude Dr. Richmond, arguing that she is not qualified as an expert "because she did not have an active clinical practice [("ACP")] in neurosurgery or [a] related field of medicine within one year of the alleged negligence," which Va. Code § 8.01-581.20(A) requires. Defs.' Mem. Supp. Defs.' Mot. Limine at 4. Hartman opposes, arguing that Dr. Richmond had had an ACP within the meaning of that Code provision as interpreted.

Notably, the Defendants have moved to exclude Dr. Richmond based predominately on her deposition examination. The Plaintiffs have sought to clarify some of the examination by appending an affidavit. *See* Aff. Isabelle Richmond, M.D. The parties have agreed that, for the purposes of this motion, the Court may consider, and assume to be true, the pertinent facts in Dr. Richmond's deposition, her affidavit, and her answers to interrogatories (including her CV). In addition, the parties, solely for the purpose of this motion, have stipulated that the date of the surgery in issue was June 5, 2000, and that this type of surgery is very rare.

After examining the arguments, Va. Code § 8.01-581.20(A), and the agreed facts, it is clear that Dr. Richmond had an ACP regarding all of the allegedly breached duties except for the duty of care required during surgery. It is unclear whether Dr. Richmond engaged in intra-cranial surgery for a CH or a similar condition within one year of June 5, 2000. Therefore, the Motion is overruled regarding all matters except for the last. However, Plaintiff's counsel is welcome to file, in timely fashion, any additional materials confirming that Dr. Richmond performed the same or similar intra-cranial surgery within one year of June 5, 2000.

## II. Issue

Under the facts, does Isabelle Richmond, M.D., meet the ACP requirement of Code § 8.01-581.20(A) to be certified as an expert in this medical malpractice action?

## III. Analysis

### A. *Statutory Requirements for Experts in Medical Malpractice Litigation*

Physicians licensed in Virginia are presumed to know the standard of care in their specialty or field of medicine. Va. Code § 8.01-581.20(A). An adverse party may rebut this presumption by showing that the physician does not the meet the requirements of Code § 8.01-581.20(A). *Hinkley v. Koehler*, 269 Va. 82, 87 (2005); *Wright v. Kaye*, 267 Va. 510, 518 (2004) (discussing the presumption and the adverse party's burden to rebut). That Code section provides in relevant part:

> A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

Va. Code § 8.01-581.20(A).

The Supreme Court of Virginia has characterized Code § 8.01-581.20(A) as having both: (1) a *knowledge requirement*, and (2) an *active clinical practice requirement*. *Hinkley*, 269 Va. at 91. The Court has further concluded that "both of these requirements must be satisfied before an expert can testify as to the standard of care." *Id.* (citing and quoting *Wright*, 267 Va. at 520; *Perdieu v. Blackstone Family Practice Ctr., Inc.*, 264 Va. 408, 418 (2004); *Noll v. Rahall*, 219 Va. 795, 800 (1979); and *Swersky v. Higgins*, 194 Va. 983, 985 (1953)). The Court has explained that the "purpose of these requirements . . . is to prevent testimony by an individual who has not recently engaged in the actual performance of the procedures at issue in a case." *Perdieu*, 264 Va. at 419 (citing and quoting *Sami v. Varn*, 260 Va. 280, 285 (2000) (internal quotations omitted)).

Here, the defendants do not challenge Dr. Richmond on the knowledge requirement, but only argue that she does not meet the ACP requirement.

## B. *Supreme Court of Virginia's Interpretation of an Active Clinical Practice*

Whether a proffered expert has an ACP is a two-part, fact-based question. First, within the context of the alleged breaches of duty, the medical procedure at issue must be determined. Second, the Court must apply the credentials of the proffered expert to that or those procedures.

### 1. *Relevant Medical Procedure in Context of the Alleged Duty Breaches*

The Court must first identify the "relevant medical procedure at issue in a case . . . read in the context of the actions by which the defendant is alleged to have deviated from the standard of care." *Hinkley*, 269 Va. at 89 (citing and quoting *Wright*, 267 Va. at 523). Notably, this is the process of analysis required for both the knowledge and ACP requirements. In this context, the defendants point to *Hinkley v. Koehler*, 269 Va. 82, as being determinative. The plaintiff points to *Wright v. Kaye*, 267 Va. 510, and *Sami v. Varn*, 260 Va. 280. No court has directly examined what constitutes an ACP in the treatment of a CH, but these decisions are instructive.

#### a. *Wright v. Kaye*

In *Wright*, Dr. Kaye performed surgery on Wright to determine the source of chronic pelvic pain. *Wright*, 267 Va. at 515. During the procedure, a cyst was found on her urachus. *Id.* The "urachus" is "an epitheliod cord surrounded by fibrous tissue extending from the apex of the bladder to the umbilicus. In the embryo, it is continuous with the allantoic stalk; postnatally it forms the middle umbilical ligament of the bladder." *Taber's Cyclopedic Med. Dictionary* 2180 (19th ed. 2002). Dr. Kaye removed the cyst and used a stapler to close the affected area. Approximately one year later, after experiencing urinary frequency and urgency with bladder spasms, another surgeon discovered and removed six surgical staples from Wright' bladder. *Wright*, 267 Va. at 515-17.

Before trial, Wright designated three experts to testify who specialized in the same field of medicine as Dr. Kaye, but none of whom had actually removed an urachal cyst. The circuit court sustained Dr. Kaye's motion *in limine*, finding that the removal of an urachal cyst was necessary to meet Va. Code § 8.01-581.20(A). *Id.*

The Supreme Court reversed, finding the procedure at issue not to be the removal of an urachal cyst, but the use of a surgical stapler in the pelvic region. As such, a permissible expert need only have performed surgery in the female pelvic area with a surgical stapler to understand the standard of care to be used. *Id.* In the present case, no such specificity with regard to surgical instruments is alleged in the Motion for Judgment. Failing to use the requisite level of care in "treating" Mrs. Hartman, as alleged in the Motion for Judgment, however, necessarily implicates the performance of intra-cranial surgery.

Additionally, the *Wright* Court, in its analysis, rejected the notion that an expert who treated a herniated disc at L5 or L3 could not testify as to the proper procedures to be utilized in the treatment of a herniated disc at L4. *Id.* at 524 (discussing *Lawson v. Elkins*, 252 Va. 352 (1996)). Likewise, the *Wright* Court rejected the notion that an expert who treated a fracture in the left hip could not testify as to a fracture in the right hip. *Id.* (discussing *Perdieu*, 264 Va. 408). The Court opined in *Wright* that "the General Assembly did not intend to write such a narrow test" and "the phrase `actual performance of the procedures at issue in a case' is not to be given a narrow construction inconsistent with the plain terms of the statute." *Id.*

## b. *Sami v. Varn*

In *Sami*, the plaintiff, who was pregnant, went to the same emergency room on two occasions complaining of abdominal pain and bleeding. *Sami*, 260 Va. at 282-83. Several examining physicians concluded that she had had a miscarriage. Nothing more was done. However, Sami continued to experience abdominal pains and went to an obstetrician-gynecologist ("OB-GYN"), who performed surgery and discovered a second uterus with a dead fetus within it. Sami filed a motion for judgment. *Id.* at 282-83.

Sami proffered an OB-GYN, which expert was excluded by the trial court on the defendant's motion, finding that the proffered expert did not have an ACP in the emergency room or a related field. *Id.* at 283. The Supreme Court reversed, determining that the same standard of care was applicable in emergency room care and obstetrical care. *Id.* at 285-86. Because the proffered expert had conducted a pelvic exam within one year of the alleged negligence, he met the active clinical practice requirement. *Id.* at 283-86.

In *Sami*, the procedure at issue was a pelvic examination. The proffered expert did not have to treat a patient with identical symptoms, but merely have given a pelvic examination within one year. *Id.* at 285.

### c. *Hinkley v. Koehler*

Defendants point to *Hinkley* as being determinative of this matter. 269 Va. 82. The *Hinkley* litigation involved the death of both of the plaintiff's twins *in utero*. The plaintiff alleged (1) a failure to provide proper medical treatment and (2) a failure to properly make a delivery decision to intervene to save the second twin's life after the first had died. *Id.* at 89-90. The procedure at issue included both of these allegations.

The *Hinkley* Court determined that the proffered expert had not directly cared for, provided treatment or management to, or made delivery decisions for *any* pregnancy within the applicable time period. The proffered expert was *merely a teacher and consultant in the field of obstetrics*. The proffered expert did not have an ACP. *Id.* at 89-91.

Notably, the Court summarily rejected the defendant's argument that the expert could not testify "merely because he personally had never had an obstetrical patient with twin-to-twin transfusion syndrome." *Id.* at 91, n. 4. Although *obiter dictum*, this suggests that the ACP requirement is not so strict as to require the proffered expert have engaged in the exact procedure with the exact considerations as the defendant doctor. This footnote basically restates the holdings of *Wright* and *Sami*.

### d. *Wright-Sami-Hinkley Analysis*

Consequently, the procedure on which the proffered expert is adjudged may be somewhat broader or more general than the exact procedure employed by the defendant who caused the alleged negligence. However, if not specifically the same procedure, it must clearly be the same essential sort of procedure.

The relevant medical procedure at issue here is the overall treatment, ultimately including surgery, of a CH in Ms. Hartman's brain. The Motion for Judgment alleges a laundry list of breached duties, including a failure to:

> (1) Inform or advise her of the risks and complications involved in the surgical procedure;
>
> (2) Obtain complete and accurate informed consent from her;
>
> (3) Advise her of other options for treating her condition; and
>
> (4) Employ a reasonable amount of attention and skill in examining, diagnosing, and treating her.

*See* Pl.'s Mot. J. at 2-3.

Everything alleged by the Plaintiff until the phrase "treating her" concerns pre-surgical activities. An expert who has advised of risks, obtained consent, advised of medical options, and examined and diagnosed a patient with a CH or essentially similar condition within one year of the alleged breach of duty may provide expert testimony. But a surgery did occur, and pursuant to Code § 8.01-581.20(A), an expert who has operated within one year of June 5, 2000, is necessary to establish evidence on the standard of care to be utilized during the resection of a CH or similar intra-cranial surgery.[1] The necessary degree of specificity is intra-cranial surgery, not specifically resection of a CH. As in *Wright*, the stipulation provided for the purpose of this motion, "does not reflect evidence establishing a unique standard of care" for resection of a CH that differs from the standard of care for other intra-cranial surgery. *Wright*, 267 Va. at 521.

## 2. Application of Dr. Richmond's Credentials to the Procedures at Issue

### a. Dr. Richmond's Pre-Surgical Clinical Practice

Dr. Richmond's Affidavit makes it clear that she was at least engaged in pre-surgical clinical practice within one year of Ms. Hartman's surgery, June 5, 2000. Specifically, Dr. Richmond states that she has a "distinct recollection of having seen a patient within approximately a month of [her] retirement whom [she] had been following for years for a large CH that had bled in the past" and that she "can say that [she] was definitely involved in the direct care of a patient like Ms. Hartman within one year of June 5, 2000." Isabelle Richmond, M.D., Aff. at 1-2. Based on this sworn testimony, Dr. Richmond has, for at least one patient within one year of June 5, 2000, engaged in pre-surgical procedures, similar, if not identical, to Ms. Hartman's CH condition within the meaning of Code § 8.01-581.20(A).

---

[1] Analogous to *Wright*, where the expert need only have used a surgical stapler while operating in the pelvic region, and not necessarily to remove an urachal cyst, the ideal proffered expert here would have used the same surgical instruments intracranially, but not necessarily to remove a CH. If it were otherwise, there would possibly be no physicians who could testify regarding rare procedures and the rule would completely undermine all rare medical malpractice litigation essentially eliminating the plaintiff's rights at the outset. This cannot be the intent of the General Assembly. Additionally, this distinction between pre-surgical and surgical activities is justified under both the *Wright* and *Sami* holdings. *Wright* concerned a surgery. *Wright*, 267 Va. 510. *Sami* concerned pre-surgical treatment, similar to that alleged here. *Sami*, 260 Va. 280.

## b. *Dr. Richmond's Surgical Clinical Practice*

It is unclear, however, based on the current record, whether Dr. Richmond actually engaged in surgical clinical practice of a CH or other intra-cranial surgery utilizing similar procedures within one year of June 5, 2000. Notably, this could be for any condition where a craniotomy is necessary to treat the condition surgically. Examples might be surgery for a brain tumor, cerebral aneurysm, trauma to brain tissues, etc. Such surgery would not necessarily involve a CH but would have to involve intra-cranial surgery.

Dr. Richmond's Affidavit, Deposition, and Answers to Interrogatories with attached CV are helpful but are somewhat unclear on this point. For example, Dr. Richmond's CV provides that she was an "Attending Surgeon" in her practice up until July 2005. Isabelle L. Richmond, M.D., Ph. D., Curriculum Vitae at 2. Additionally, Dr. Richmond stated in her Deposition that she "stopped performing *neurosurgical* procedures in July 2000." Isabelle Louise Richmond, M.D., Ph. D., Dep. at 13 (emphasis added). Similarly, when asked: "were you actively performing *neurosurgical* procedures before June 30th of 2000?" she replied, "yes, sir." Isabelle Louise Richmond, M.D., Ph. D., Dep. at 16 (emphasis added). Finally, in her Affidavit, reaffirming her statements in her Deposition, Dr. Richmond provides: "I did state that between 1990 and 2000, I was certain that I had resected cavernous angiomas." Isabelle Richmond, M.D., Aff. at 2. The time line at issue here has not been sufficiently bracketed. In other words, using the quotes cited above, if Dr. Richards stopped neurosurgical procedures in July 2000, it does not necessarily follow that she performed any such procedures within one year. Similarly, the fact that she was actively performing such procedures before June 30th, 2000, could mean only that she performed them in the 1980s. The time line must be bracketed for the one year period immediately before or after June 5, 2000.

Although these statements suggest that Dr. Richmond may have performed intra-cranial surgery within one year of June 5, 2000, they do not conclusively establish that fact. As such, defendants have an argument that Dr. Richmond cannot be certified as an expert to testify regarding the standard of care owed *during surgery* to remove a CH or a like operation. The Motion *in Limine* is presently sustained with regard to Dr. Richmond testifying as to the standard of care during surgery, but, as a trial date has not been set, the Plaintiff is welcome to submit, in timely fashion, any additional materials to clarify this point.

*IV. Conclusion*

Va. Code § 8.01-581.20(A) requires that a proffered expert have an ACP regarding the procedure(s) at issue in the malpractice litigation within one year of the duty breach(es). Dr. Richmond clearly had engaged in all of the parts of medical practice related to the management of a CH except intra-cranial surgery, which is not clearly established. As such, the Motion is overruled, except with regard to whether Dr. Richmond actually engaged in intra-cranial surgery within one year of June 5, 2000, to which the Motion is sustained pending any clarification.