**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LATARSHA CREEKMORE,

      *Plaintiff-Appellee,*

v.

MARYVIEW HOSPITAL,

      *Defendant-Appellant,*

and

UNITED STATES OF AMERICA,

      *Defendant.*

No. 10-1183

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry Coke Morgan, Jr., Senior District Judge.
(2:08-cv-00235-HCM-JEB; 2:09-cv-00057-HCM-FBS)

Argued: September 22, 2011

Decided: December 8, 2011

Before WILKINSON, WYNN, and FLOYD, Circuit Judges.

---

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Wilkinson and Judge Floyd joined.

---

## COUNSEL

Brewster Stone Rawls, RAWLS & MCNELIS, PC, Richmond, Virginia, for Appellant. Kim Michelle Crump, Norfolk, Virginia, for Appellee.

## OPINION

WYNN, Circuit Judge:

Plaintiff Latarsha Creekmore sued Defendant Maryview Hospital ("Maryview"),[1] alleging that its negligent care following the Caesarean section delivery of her baby injured her. After a three-day bench trial, the district court found Maryview liable for medical malpractice and entered a judgment awarding Creekmore nine hundred thousand dollars ($900,000.00) in damages.

Maryview appeals, arguing that the district court abused its discretion by allowing an obstetrician-gynecologist ("OB-GYN") to testify as an expert regarding the standard of care for a nurse's postpartum monitoring of a high-risk patient with preeclampsia. Maryview maintains that Creekmore failed to make her prima facie case for negligence because the testimony of the OB-GYN did not meet the expert testimony requirements of Virginia Code § 8.01-581.20. Because neither the statute nor Virginia case law precludes the expert testimony in question, we find no abuse of discretion and affirm.

---

[1]Because Dr. Sidath Jayanetti, the defendant doctor in this case, was a federal employee "acting within the scope of his office or employment at the time of the incident out of which the claim arose," the United States was substituted as the named party defendant. 28 U.S.C. § 2679(d)(1); *see also* 42 U.S.C. § 233(c) (providing for the removal of such actions to federal district court). Although Creekmore settled with the United States before trial, the district court retained subject matter jurisdiction over the case on the basis of the supplemental jurisdiction statute, 28 U.S.C. § 1367. The appeal before us involves only defendant Maryview.

I.

On February 25, 2005, Creekmore was admitted to Maryview's Labor and Delivery Unit for the delivery of her fourth child. She had a history of pregnancy-induced high blood pressure, known as severe preeclampsia. Around 7:00 p.m., Creekmore gave birth to a baby boy via a Caesarean section ("C-section") performed by Dr. Sidath Jayanetti, an OB-GYN. She was then taken to a recovery room and attached to a machine that automatically monitored and recorded her blood pressure and heart rate every ten minutes.

Sandra Sutliff, an obstetrics nurse, was assigned to attend to Creekmore, who was the only patient in Sutliff's care for the night. Dr. Jayanetti gave Sutliff orders to check Creekmore's incision site and uterus for bleeding initially every half-hour and then every hour. Hospital records and testimony from Creekmore's partner, Whitt Johnson, indicate that over the next several hours, Creekmore's blood pressure and heart rate were erratic, and that her urine output and general physical condition declined. According to Dr. Richard Stokes, Creekmore's expert OB-GYN, these three symptoms—falling blood pressure, rising pulse rate, and lack of urine output—are "classic signs of blood loss shock," which can be a result of excessive bleeding, a significant and well-known risk to patients with preeclampsia such as Creekmore.

Around midnight, Johnson noticed that Creekmore had begun to have hot flashes and to sweat; he paged the nurse twice but got no response. Sutliff checked on Creekmore at 1:00 a.m. and recorded only that she was resting comfortably, despite readings from the monitors showing low blood pressure and a high heart rate. Over the next hour and a half, Creekmore's blood pressure continued to drop, and her heart rate increased gradually. Johnson paged the nurse again, still with no answer.

At 2:26 a.m., in response to a significant difference between Creekmore's systolic and diastolic arterial blood

pressures, or pulse pressure, nurse Christine Weber directed Sutliff to administer a large quantity of intravenous fluid, or bolus, to raise Creekmore's low diastolic pressure. However, less than twenty minutes later, at 2:45 a.m., an alarm on Creekmore's monitor sounded when her blood pressure descended precipitously. Sutliff responded to the alarm and recorded that Creekmore was clammy and unresponsive, sweating profusely, and had gone into hypovolemic shock from low blood volume. Sutliff also noted that Creekmore's urine output had dropped dramatically. She administered another bolus.

Three minutes later, at 2:48 a.m., Weber called Dr. Jayanetti to inform him of Creekmore's blood pressure and urine output. Another nurse called Dr. Jayanetti again at 3:07 a.m., and Sutliff called him at 3:08 a.m. and told him that Creekmore was unresponsive. On Dr. Jayanetti's instructions, Sutliff summoned the house resident, who arrived in Creekmore's room at 3:10 a.m. At that point, Johnson recalled being awoken and asked to move out of the way, as he watched several people come into the room, move Creekmore into another bed, and wheel her out. He noticed a significant amount of blood on Creekmore's sheets and gown.

Creekmore was transferred to the surgical intensive care unit at 3:28 a.m. Upon evaluation, it was determined that she had lost approximately half of her blood volume, causing oxygen deprivation to the brain and a massive stroke. Dr. Stokes testified that he believed Creekmore had suffered from hemolyses low platelets (HELLP) syndrome, a severe form of preeclampsia that can result in a loss of the ability to clot one's blood, or disseminated intravascular coagulopathy (DIC). Creekmore underwent additional surgery as well as transfusions of clotting factors and blood.

As a result of her stroke, Creekmore suffered severe and painful physical and cognitive impairments that continue to impact her life today. On February 5, 2009, Creekmore filed

a complaint against, among others, Maryview, seeking three million five hundred thousand dollars ($3,500,000). Following dismissal of the United States as a party, Creekmore filed a motion to remand the remaining claims against Maryview to state court in Virginia. On November 16, 2009, the district court denied that motion and retained jurisdiction pursuant to its discretionary authority under 28 U.S.C. § 1367(c), identifying convenience and fairness to the parties and considerations of judicial economy as the key factors in its decision. The matter proceeded to a bench trial on December 9, 10, and 11, 2009, and the district court entered judgment in favor of Creekmore on January 10, 2010. Maryview appealed.

## II.

On appeal, Maryview contends that the district court should have barred Dr. Stokes, an OB-GYN, from testifying as an expert with respect to the standard of care for a nurse's post-partum monitoring of a high-risk patient with preeclampsia. We review the trial court's determination of this issue for abuse of discretion. *See United States v. Grimmond*, 137 F.3d 823, 831 (4th Cir. 1998) ("A district court's evidentiary rulings are reviewed under the narrow abuse of discretion standard."); *Hinkley v. Koehler*, 269 Va. 82, 91, 606 S.E.2d 803, 808 (2005) ("[A]scertaining whether a proffered witness is qualified to testify as an expert is a determination lying within the sound discretion of the trial court" that will not be reversed "'unless it appears clearly that [the expert] was not qualified in the field in which he gives evidence.'" (quoting *Swersky v. Higgins*, 194 Va. 983, 985, 76 S.E.2d 200, 202 (1953))).

It is worthwhile to point out that because this case was heard by a federal district court, the Federal Rules of Evidence would generally control the admissibility of expert witness testimony. *See, e.g.*, *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 475-76 (4th Cir. 2005) (noting that in diversity cases, federal evidentiary law governs the

procedural question of the admissibility of expert testimony, while state law controls substantive matters concerning the sufficiency of evidence).

Nevertheless, because the testimony at issue here was required for a medical malpractice claim under Virginia law, the sufficiency of its substance to meet plaintiff's prima facie case is governed by state law. *See Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 110 (4th Cir. 1995) ("[T]here are circumstances in which a question of admissibility of evidence is so intertwined with a state substantive rule that the state rule . . . will be followed in order to give full effect to the state's substantive policy." (internal quotation marks omitted) (quoting *DiAntonio v. Northampton-Accomack Mem'l Hosp.*, 628 F.2d 287, 291 (4th Cir. 1980))).

Under either the Federal Rules of Evidence or the Virginia Rules of Evidence, the district court's decision to allow Dr. Stokes to testify as an expert was discretionary and is reviewed as such. Thus, our analysis and conclusion remain the same regardless of which evidentiary rules control.

In an action for medical malpractice under Virginia law,

> the standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent *practitioner* in the field of practice or specialty in this Commonwealth, and the testimony of an expert witness, otherwise qualified, as to such standard of care, shall be admitted.

Va. Code § 8.01-581.20(A) (2010) (emphasis added). A witness shall be qualified as an expert in the applicable standard of care

> if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct

conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

*Id.* Both requirements—the so-called "knowledge requirement" and the "active clinical practice requirement"—must be satisfied before an expert may testify regarding the standard of care. *Hinkley*, 269 Va. at 88, 606 S.E.2d at 806.

The knowledge requirement does not demand an identical level of education or degree of specialization; rather, it can be shown by "evidence that the standard of care, as it relates to the alleged negligent act or treatment, is the same for the proffered expert's specialty as it is for the defendant doctor's specialty." *Jackson v. Qureshi*, 277 Va. 114, 122, 671 S.E.2d 163, 167 (2009) (citation omitted). Thus, the inquiry focuses on the expert's knowledge of, and experience with, the specific procedure at issue, not on the expert's professional qualifications relative to those of the defendant practitioner.

The active clinical practice requirement likewise concerns the "'relevant medical procedure' at issue in a case" or, more specifically, the "'actual performance of the procedures at issue,'" which "must be read in the context of the actions by which the defendant is alleged to have deviated from the standard of care." *Hinkley*, 269 Va. at 89, 606 S.E.2d at 807 (quoting *Wright v. Kaye*, 267 Va. 510, 522-23, 593 S.E.2d 307, 313-14 (2004)). The Virginia Supreme Court has stated that "[o]ne of the purposes of that [active clinical practice] requirement is to prevent testimony by individuals who do not provide healthcare services in the same context in which it is alleged that a defendant deviated from the standard of care." *Hinkley*, 269 Va. at 91, 606 S.E.2d at 808.

Taken together, these cases indicate that the Virginia Supreme Court elevates the *substance* of an expert's back-

ground, knowledge, and practice over a particular title or form. *See, e.g.*, *Jackson*, 277 Va. at 126, 671 S.E.2d at 169 (permitting a pediatrician specializing in pediatric infectious diseases to testify on the standard of care for a pediatrician specializing in emergency medicine, where the standards for both pediatricians overlapped as to the relevant procedure); *Hinkley*, 269 Va. at 91, 606 S.E.2d at 808 (finding an abuse of discretion in the admission of expert testimony from a doctor in the same specialty as the defendant doctor because the purported expert's teaching and consultation work did not qualify him to testify concerning the direct care and management of a pregnancy); *Lloyd v. Kime*, 275 Va. 98, 112-13, 654 S.E.2d 563, 571 (2008) (finding a neurologist qualified as an expert on the standard of care for post-operative evaluation and treatment because the standard of care is the same in that setting for neurologists, neurosurgeons, and orthopedists); *Wright*, 267 Va. at 522, 593 S.E.2d at 313-14 (rejecting the defendant doctor's argument that a witness must have performed the same procedure with the exact same pathology to be qualified as an expert); *Perdieu v. Blackstone Family Practice Ctr., Inc.*, 264 Va. 408, 419-20, 568 S.E.2d 703, 709-10 (2002) (focusing on whether the proffered experts had "recently engaged in the actual performance of the procedures at issue," rather than their titles or prior experience (internal quotation marks and citation omitted)); *Griffett v. Ryan*, 247 Va. 465, 472-73, 443 S.E.2d 149, 153-54 (1994) (holding that an internist was qualified to testify as an expert because the evidence demonstrated that the standard of care applicable to the internist did not vary from the standard of care in the defendant's specialty, gastroenterology, a subspecialty of internal medicine).

In this regard, the Virginia Supreme Court's opinion in *Sami v. Varn*, 260 Va. 280, 535 S.E.2d 172 (2000), is particularly instructive. In that case, the trial court had held that an OB-GYN was not qualified to testify as an expert regarding the standard of care applicable to two emergency room physicians who had conducted plaintiff's pelvic examinations. *Id.*

at 283, 535 S.E.2d at 173. The Virginia Supreme Court reversed, holding that to meet the definition of "related field of medicine," "it is sufficient if in the expert witness' clinical practice the expert performs the procedure at issue and the standard of care for performing the procedure is the same." *Id.* at 285, 535 S.E.2d at 175.

Here, the standard of care at issue concerns the postpartum monitoring of a high-risk patient with preeclampsia. According-ing to the uncontroverted testimony of Creekmore's expert Dr. Stokes, the risks inherent to patients with preeclampsia are well known to both physicians and nurses working in the field of obstetrics. Even more importantly, Dr. Stokes offered the following unrebutted testimony:

> [T]here is a great deal of things where [doctors and nurses] overlap, and *I do exactly the same things that nurses do*. So while I don't have an R.N., we take blood pressures the same way. We take pulses the same way. We examine uteruses the same way. We check for bleeding in the bed the same way. So I have been employed as a physician to do exactly the same things nurses do.

(Emphasis added.) Dr. Stokes stated that "one of the things a nurse is supposed to do is to check the patients for signs of potential bleeding," including her wound, her womb, and her urine output, which was not done here for six hours.

Dr. Stokes testified that "[t]he failure to appreciate the dras-tic fall in blood pressure, combined with a rise in pulse and no urine, classic for blood loss shock, which [Creekmore] had, was a gross violation of the standard of care." Moreover, after Creekmore had gone into shock, Dr. Stokes maintained that "not hav[ing] a doctor appear from 2:45 to 3:10 [a.m.] was also a gross violation of the care because medicine would have to be ordered, blood would have to be ordered, and the nurse cannot do that." Because of Sutliff's failure to monitor

Creekmore or to call a doctor to ensure heightened medical attention and treatment that could have prevented Creekmore's going into shock and ultimately suffering a stroke, Dr. Stokes opined that she "failed to meet the applicable standard of care for caring for a postpartum, high risk patient."

Maryview maintains that the district court abused its discretion by permitting Dr. Stokes to testify regarding the standard of care for obstetrical nurses because Dr. Stokes did not have an active clinical practice in nursing. We disagree. It is undisputed that Dr. Stokes regularly performs the procedure at issue—the postpartum monitoring of high-risk patients with preeclampsia—and "the standard of care for performing the procedure is the same." *Sami*, 260 Va. at 285, 535 S.E.2d at 175. As such, he "provide[s] healthcare services in the same context in which it is alleged that [the] defendant deviated from the standard of care," fulfilling the purpose of the active clinical practice requirement. *Hinkley*, 269 Va. at 91, 606 S.E.2d at 808.

Because precedent from the Virginia Supreme Court supports the district court's ruling in this case, we are unwilling to conclude that allowing Dr. Stokes to testify as an expert regarding the applicable standard of care was an abuse of discretion. *See id.* (noting that the determination of whether a proffered witness is qualified to testify as an expert regarding the applicable standard of care is a question within the sound discretion of the trial court). Put another way, this record does not indicate that Dr. Stokes was not qualified under Virginia law as an expert in the postpartum monitoring of a high-risk patient with preeclampsia. *See id.* (stating that the decision to allow an expert to testify will not be reversed "unless it appears *clearly* that [the expert] was not qualified in the field in which he gives evidence." (emphasis added) (internal quotation marks and citation omitted)).

This approach is also in keeping with our own Court's rule not to set aside or reverse a judgment on the grounds that evi-

dence was erroneously admitted unless justice so requires or a party's substantial rights are affected. Fed. R. Civ. P. 61; *Blum v. Cottrell*, 276 F.2d 689, 693-94 (4th Cir. 1960) ("[N]o error in any ruling is a ground for disturbing a judgment unless refusal to take such action appears to the court inconsistent with substantial justice; and the courts of appeals are directed . . . to give judgment without regard to harmless errors which do not affect the substantial rights of the parties.").

Here, even if the admission of Dr. Stokes's expert testimony was an abuse of discretion, Maryview's failure to move either for judgment as a matter of law or to strike the evidence, challenging the sufficiency of Creekmore's case-in-chief, results in all subsequently admitted evidence being allowed to establish Creekmore's prima facie case. *See Kadala v. Amoco Oil Co.*, 820 F.2d 1355, 1358 (4th Cir. 1987) ("Once a trial court has before it all the evidence necessary to decide a question, the sequential presentation of evidence does not matter."); *Perdieu*, 264 Va. at 418, 568 S.E.2d at 709 (noting that a defendant may challenge the sufficiency of a plaintiff's case-in-chief with a motion to strike the evidence, which should be granted "only when it is conclusively apparent that plaintiff has proven no cause of action against defendant" (internal quotation marks and citations omitted)).

As noted by the district court, Creekmore had a nurse testify during rebuttal to "pretty much the same" as what Dr. Stokes said with respect to the standard of care. Thus, taking a global view of the evidence, Creekmore made out her prima facie case of negligence even without Dr. Stokes as an expert in the applicable standard of care.

### III.

In sum, Dr. Stokes performs postpartum monitoring of high-risk patients with preeclampsia, the same procedure in the same context in which it is alleged that Maryview and its

nurses deviated from the standard of care. As such, it does not appear that Dr. Stokes was not qualified to testify as an expert in the standard of care under Virginia law. Accordingly, we find no abuse of discretion and affirm the judgment below.

*AFFIRMED*