COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Fulton, Causey and Raphael
Argued at Lexington, Virginia


BARBARA H. CLEMENTS, ADMINISTRATOR OF
  THE ESTATE OF FRED HODNETT, DECEASED
                                                    MEMORANDUM OPINION[*] BY
v.       Record No. 1060-23-3                       JUDGE JUNIUS P. FULTON, III
                                                         AUGUST 27, 2024
MEDICAL FACILITIES OF AMERICA, INC., ET AL.


               FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
                           Stacey W. Moreau, Judge

           L. Steven Emmert (Robert W. Carter, Jr.; Mary Estfanous; Sykes,
           Bourdon, Ahern & Levy, P.C., on briefs), for appellant.

           Nathan H. Schnetzler (Samuel T. Bernier; Katherine C. Londos;
           Frith Anderson & Peake, P.C., on brief), for appellees.


        This is an appeal of a final judgment of the Pittsylvania Circuit Court in a wrongful death

suit alleging medical negligence.  Appellant Barbara H. Clements qualified as administrator of the

estate of Fred Hodnett, the decedent.  Hodnett was a patient at a Pittsylvania County nursing home

operated by three entities—Medical Facilities of America, Inc., Medical Facilities of America LIII

(53) L.P., and Gretna Health Care Center II, L.P. ("appellees").  Clements alleged that appellees'

medical staff was negligent in their care of Hodnett, leading to significant pressure ulcers—also

referred to colloquially as "bed sores"—during his roughly eight-month stay at the nursing home.

Clements also alleged that the medical staff negligently failed to test Hodnett's stool for an

infection—*clostridium difficile* ("*C. diff.*").  Ultimately, due to the combination of the bed sores and

the infection, Hodnett developed sepsis and passed away in June 2014.

---

        [*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

Clements brought a wrongful death action as the administrator of Hodnett's estate. During the pretrial phase, the trial court entered an order restricting the testimony of two fact witnesses Clements anticipated calling for her case-in-chief. Then on the first day of trial, the trial court struck Clements's remaining standard of care expert witness. Clements conceded that she could not present a prima facie case without her standard of care expert, and the trial court subsequently granted appellees' motion for summary judgment. Clements timely appealed, challenging the trial court's decision to strike her standard of care expert as well as restrict the testimony of the two fact witnesses. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

BACKGROUND[1]

I. Background Facts

At age 88, Hodnett was admitted to Gretna Health & Rehabilitation Center ("the nursing home") on September 4, 2013, for medical issues unrelated to this case. He did not have any pressure ulcers when he was initially admitted to the nursing home. On October 14, 2013, Hodnett was first documented to have "a linear tear to his midline buttocks measuring 6.8 cm x 2.5 cm x 5 < 0.1 cm, and excoriation to the sacral area." (Compl. at 3-4).[2] Hodnett was

_____

[1] "Under well-settled principles, we review the record applying the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009) (citing *Dickerson v. Fatehi*, 253 Va. 324, 327 (1997)). "In this context, [the Supreme Court has] repeatedly held that summary judgment is a drastic remedy, available only when there are no material facts genuinely in dispute." *Id.* (citing *Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 618 (2005)); *see also Smith v. Smith*, 254 Va. 99, 103 (1997); *Slone v. General Motors Corp.*, 249 Va. 520, 522 (1995). "Thus, if the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence, summary judgment is not appropriate." *Id.* (citing *Jenkins v. Pyles*, 269 Va. 383, 388 (2005)).

[2] Because the trial ended prior to a full development of all the facts of this case, we recite the facts as pled in Clements's complaint, as necessary. *See A.H. ex rel. C.H. v. Church of God*

- 2 -

transferred from the nursing home to Danville Regional Medical Center ("DRMC"),[3] where he was documented on admission to have stage II pressure ulcers to his sacrum[4] and left toes. Hodnett was treated for the linear tear at DRMC.

On October 18, 2013, Hodnett was discharged from DRMC and sent back to the nursing home. Upon re-admission, the nursing home documented that Hodnett had an "unstageable pressure ulcer to his sacrum and buttocks measuring 9.4 cm x 10.5 cm with three open areas to the wound bed." (Compl. at 4). On January 25, 2014, the nursing home documented that Hodnett was having "frequent large loose stools with foul odor." (Compl. at 4). This foul odor was an indicator that Hodnett was suffering from *C. diff.* diarrhea, an infection which patients such as Hodnett frequently suffer from. Notwithstanding this symptom, Hodnett was not diagnosed with *C. diff.* until more than four months later, in March of 2014.

At the same time, Hodnett's pressure ulcers also continued to spread. The sacral pressure ulcer became infected and resulted in sepsis, requiring "antibiotics, repeated debridement, pulse irrigation, a wound vac, and the continued use of a Foley catheter, which itself resulted in multiple urinary tract infections." (Compl. at 4). Hodnett died on June 1, 2014.

Clements qualified as the administrator of Hodnett's estate, and in November of 2018 filed a complaint[5] against appellees, alleging medical negligence, a survival action, and a

---

*in Christ, Inc.*, 297 Va. 604, 614 (2019) ("Our recitation of the facts, of course, restates only factual allegations that, even if plausibly pleaded, are as yet wholly untested by the adversarial process.").

[3] Clements also named DRMC as a defendant to the suit. However, DRMC settled any and all claims asserted against it and was released as a defendant. It is not a party to this appeal.

[4] The sacrum is a large, triangular bone at the base of the spine.

[5] Clements suffered a non-suit of her first complaint, and timely re-filed the instant complaint. The timeliness of the complaint underlying this appeal is not at issue.

wrongful death action.  Specifically, Clements alleged that appellees "failed to prevent and properly treat Hodnett's pressure ulcers."  Clements alleged that:

> At all times relevant, Hodnett was at risk to develop pressure ulcers.  Specifically, he had a medical history that included advanced age, iron deficiency anemia, protein malnutrition, dehydration, significant weight loss, weakness, limited range of motion, decreased mobility, and nonambulation.  Hodnett was also incontinent of bowel and depended on the [appellees'] staff for all aspects of his care, including turning and repositioning [Hodnett] in [his] bed and chair.

Clements alleged that the nursing home nursing staff failed to turn and reposition Hodnett, and also failed to properly diagnose the infection he contracted after re-admission to the nursing home.  These two failures, according to Clements, fell below the standard of care that appellees owed to Hodnett and resulted in his further medical complications and ultimately his death.

## II.  Discovery and Pretrial Phase

The trial court held an initial settlement conference, at which point the trial court entered its pretrial scheduling order.  That order governed the terms and timelines applicable to the discovery period, and set a trial date of December 6-10, 2021.  That order required that counsel "exchange . . . a list of witnesses proposed to be introduced at trial."  The order set a deadline of 15 days before trial, in other words, November 22, 2021.  That order further specified that "[a]ny . . . witness not so identified . . . will not be received in evidence, except in rebuttal or for impeachment or unless the admission of such . . . testimony of the witness would cause no surprise or prejudice to the opposing party and the failure to list the . . . witness was through inadvertence."  That order also set a deadline for designating expert witnesses, specifying that Clements was required to designate experts she anticipated calling for her case-in-chief at least 90 days before trial, and was permitted to designate experts that were "responsive to new matters raised in the opposing parties['] identification of experts" at least 45 days before trial.  Those deadlines fell on September 7, 2021, and October 22, 2021, respectively.

- 4 -

During discovery, appellees asked Clements to disclose any persons having knowledge of any relevant facts to the case. Pertinent to this appeal, Clements's original May 17, 2021 response to appellees' discovery request did not disclose two of Hodnett's treating providers: Juan Aponte, M.D. and Heather Schaubach, P.A. On November 4, 2021, Clements served supplemental interrogatory responses identifying Aponte and Schaubach as having "knowledge of Fred Hodnett's care, treatment, and injuries, as reflected in the entries each made in the medical records concerning Fred Hodnett." Clements's supplemental response noted that this knowledge was based on "the medical records . . . *that [had] been exchanged to date*." Earlier in the discovery process, Clements had exchanged certain medical notes signed by Aponte and Schaubach that described the medical procedures each undertook to administer concerning Hodnett's care.

Clements also disclosed multiple retained experts to support her claims against appellees. Clements sent her initial expert designations to appellees on September 7, 2021. Clements disclosed Connie Lambert, a registered nurse and former employee of Medical Facilities of America, and Penny Crawford, a dual-licensed nurse practitioner and registered nurse, to testify as to the standard of care required of the nursing staff. Clements also noted several physicians who would testify as to the applicable standard of care, as well as the causation of Hodnett's injuries. Clements's initial expert designation identified several of Hodnett's treating providers as potentially offering both fact and opinion testimony at trial: doctors Amanda McClung, Louis Chi, James A. Avery, and a surgeon, Thomas Carrico. The designation did not identify either Aponte or Schaubach as expert witnesses. On October 22, 2021, Clements sent a supplemental designation of expert witnesses to appellees, but again did not name either Aponte or Schaubach as expert witnesses.

In November of 2021, the trial court entered an order limiting Clements to "one retained nurse expert . . . to testify against [appellees]." The trial court also limited the number of physicians who would be able to testify on Clements's behalf. Specifically, the trial court also limited Clements to "one retained physician expert," but also qualified that if Clements did not utilize Dr. Carrico as that physician expert, Dr. Carrico would still be allowed to testify "concerning opinions he formed in connection with his care and treatment of Fred Hodnett." The trial court also continued the trial to December of 2022.

The trial court issued a further order on February 10, 2022, in which it precluded Clements from calling Lambert as a standard of care expert, leaving Clements with Crawford as her only nursing standard of care expert. In that same order, the trial court limited the testimony of Aponte and Schaubach in Clements's "case-in-chief" to that of "treating health care providers with their testimony limited to what is in the medical records they prepared and that were exchanged in discovery." The trial court entered an amended pretrial scheduling order that same date stating "[a]ll discovery in this case has concluded" but noting that the parties had a continuing duty to "seasonably supplement and amend discovery responses pursuant to Rule 4:1(e)."[6]

In July of 2022, Clements served her third and fourth supplemental responses to appellees' interrogatories. Contained in these supplemental responses were significant passages dedicated to expounding upon the "knowledge of relevant facts" and "expectations" held by Aponte and Schaubach. Appellees moved to strike the supplemental responses regarding Aponte and Schaubach, arguing that the responses were untimely supplementation pursuant to the trial court's amended pretrial scheduling order, and also constituted undisclosed expert testimony

---

[6] Rule 4:1(e) provides that "[a] party who has responded to a request for discovery is under a duty to supplement or correct the response to include information thereafter acquired."

from treating health care providers. After a hearing, the trial court concluded the supplemental responses regarding Aponte and Schaubach were "expert designation that should have been done a long time ago" and that any supplementation "would have been something with regard to medical records, not an opinion that they would be providing." The trial court went on to state that the supplemental responses were "an expert designation when it comes down to it if you read it. That's exactly what is [sic] trying to use the treating physicians and the court has already ruled on that." Thus, the trial court granted appellees' motion to strike the supplemental responses.

In advance of trial, appellees moved to strike Clements's expert, Crawford. Appellees argued that Crawford, as a nurse practitioner, did not have the requisite active clinical practice to offer opinions on the standard of care applicable to the nursing home's nursing staff. Further, appellees noted that as a nurse practitioner, Crawford's scope of practice, training, and education—much like that of a physician—greatly exceeded that of the nursing home nursing staff, which consisted of RNs, LPNs, and CNAs, rendering her opinions inherently unfair. Clements filed a brief in opposition to appellees' motion to strike and requested the opportunity "to make a full evidentiary record at trial of Crawford's education, training, and experience as a nurse who provided nursing home care." After a hearing on the motion, the trial court granted in part and denied in part appellees' motion to strike Crawford, and advised Clements that (1) she would need to qualify Crawford at trial outside the presence of the jury before Crawford would be permitted to testify; and (2) appellees would have the opportunity to cross-examine Crawford as to her qualifications before Crawford would be permitted to testify.

### III.  The Trial

The case proceeded to trial in December of 2022.  After opening statements were presented, the trial court permitted Clements to call Crawford to testify outside the presence of the jury "[t]o see if she qualifie[d] as an expert."

On direct examination, Crawford testified that she was licensed as a registered nurse in Virginia, and had been since 1973.  She testified that in 1993, she also graduated from graduate school and received her nurse practitioner certificate.  Nevertheless, she continuously retained her registered nurse license in Virginia.  During the relevant time period[7]—years 2012 to 2015—she worked "both as an RN side by side with the nurses and also as a nurse practitioner" at Seaside Healthcare, a skilled nursing facility that was part of Atlantic Shores Retirement Community—a nursing home.  Crawford expressly testified that during the relevant time period, she "turn[ed] and reposition[ed] patients at bedside."  Crawford noted that "[a]s a certified wound, ostomy, and continence nurse, [she] felt it very important to get involved with the patients . . . and to be involved with nursing staff to actually treat the patients at the bedside."  This meant that she "would . . . check their wounds or assess their wounds, do their dressing changes, and take total care of that patient."  Crawford clarified that during the relevant time period when she was working at Atlantic Shores Retirement Community, she would "return to

---

[7] Code § 8.01-581.20, which governs the admissibility of medical expert testimony, provides that:

> A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine *within one year of the date of the alleged act or omission forming the basis of the action*.

Code § 8.01-581.20(A) (emphasis added).

turn and reposition the same patient after a certain interval of hours when [she] had earlier turned and repositioned that same patient." As to the relevant standard of care, Crawford testified that "patients should be turned and repositioned, particularly as they grow older, but could be all ages [sic], should be turned and repositioned every two hours just as a matter of standard—to follow the standard of care."

Crawford also noted that she would turn and reposition patients who were sitting in a chair, as well. She stated that patients should be turned and repositioned in their chair every hour.

Counsel for Clements then turned Crawford's attention to the issue of *C. diff.* Specifically, counsel asked if there were "occasions within the time frame that we have been discussing in which you would complete the requests form for *C. diff.* testing to be sent to a lab?" Crawford responded in the affirmative. Crawford also testified that she was "familiar with the concept within the nursing home of verbal orders and written orders and issuing and following those [orders]." Crawford testified that in her experience, she would "review the orders, and many times the doctors would call [her] and give [her] verbal orders to complete." She "would collect [the stool], if the stool was available. If not . . . [she] would talk to the nurses, instruct the nurse that was caring for that patient how to do that to make sure it was carried out properly."

Crawford clarified that administration of all the care she testified to—turning and repositioning patients in beds or in chairs, "making arrangements for medical transport [of patients in wheelchairs or stretchers]," the "bed mobility for patients who are dependent on staff," and "complying with orders from above"—were all "nursing decision[s]."

On cross-examination, counsel for appellees inquired of Crawford about the standard of care regarding the diagnosis and treatment of *C. diff.* At first, Crawford seemingly indicated that a nursing home's nursing staff must have a patient's stool sample submitted to a lab for *C. diff.*

testing even without a physician's order. Counsel for appellees then confronted Crawford with a federal regulation expressly mandating that a nursing home was required to have a physician order before submitting a stool sample for laboratory testing. Crawford could not identify an exception in the regulation that supported her stated understanding of the standard of care for nurses regarding lab work services. However, she then clarified:

> [A]s I said, everybody works as a team. The nurse should have sufficient knowledge to send—when to send something off. And if it's critical because the patient is very, very sick, it's critical to send it off, get the doctor's order at that time. It all has to work together. It can't just be collect an order [sic] and send it off without a physician's order. You need to all work together as a team.

The following colloquy then occurred between counsel for appellees and Crawford:

> Q: Do you believe that federal law permits a nursing home to say, hey, we really would like our nurses to be able to make decisions about labs and sending out stool without the doctor's order and put that in their policy and procedure manual?
>
> A: No, I don't, but I have seen it in policy and procedure manuals. I agree that it's against policy, Virginia regs.
>
> Q: Did you just say that you agree that what you just testified to violates Virginia and federal regs? Did you just say that?
>
> A: No. What I said was you have to work as a team. You have to all work together so it's all done at the same time so nothing gets tested without a doctor's order.

Counsel for appellees then turned to Crawford's active clinical practice during the relevant time period, and her experience turning and repositioning patients in beds and chairs. Regarding her active clinical practice experience, Crawford explained that Atlantic Shores Retirement Community included a licensed assisted living facility, an outpatient medical office, and a licensed health care facility (nursing home) called "Seaside." Crawford rotated between the three facilities, but she did not serve either as director of nursing or unit manager nurse. She also testified that she was never "scheduled on Seaside's nursing roster." Instead, she only

worked as a nurse practitioner.  Nevertheless, she noted that the reason Atlantic Shores Retirement Community valued her as an employee was because she had the dual ability to function both as a nurse practitioner and a nurse.

Crawford testified as to the distinctions in roles between the "medical team"—made up of the attending physician, physician assistants, and nurse practitioners—and the "nursing team" comprised of RNs, LNs, and CNAs.  Specifically, Crawford noted that the medical team is responsible for "diagnosing of the patients' conditions" and "issuing orders for medications and treatments and labs that then the nursing team executes."  Crawford confirmed that when she was at Seaside, she was employed as part of the medical team.  However, when asked "[s]o when you were assessing the wound care, you have your nurse practitioner brain in your head, correct?" Crawford responded "Well, I also had my wound care brain in my head because I'm both.  I'm both a nurse practitioner and a wound care nurse.  I have to not—I can't be a—you have to be a registered nurse to be a wound care specialist."  And she continued "I have that brain when I'm look[ing] at the patients and their wounds and what is going on with their wound care."

Crawford went on to confirm that as a member of the medical team, she would at times engage in assessment or diagnosis of certain wounds, sometimes directing the nursing staff to administer certain medical procedures or treatments.  She also trained nurses, when necessary, on how to administer certain treatments and care to patients.  But when asked directly by counsel for appellees, "You are making sure that the nurses are doing their job, correct?" Crawford responded:

> Right.  But that is the role of a wound care nurse.  I think you can
> see that in any of the standards that are for wound care nurses.  It's
> what we are taught as a wound care nurse.  I went to specialty
> training to become a wound care nurse.  It can't just be take a
> certification and pass.  You have to go to school, classes, attend
> that to become a wound care nurse and to be able to do that type of
> assessment.  It's different than what the nurses may do, *but I also*

> *get in there and change patients, clean them up, and evaluate them just as a nurse would.*

(Emphasis added).

On redirect examination, Crawford clarified that the standard of care that she testified to was "universal or common across all nursing disciplines," including "LPNs, RNs, and any level of graduate RN."

Upon the completion of Crawford's testimony, appellees renewed their motion to disqualify Crawford as a standard of care expert, arguing that she: 1) lacked the requisite knowledge of the standard of care applicable to the nursing home nursing staff under Code § 8.01-581.20, and 2) she failed to meet the active clinical practice prong of Code § 8.01-581.20.

After hearing argument, the trial court granted appellees' motion, finding that Clements had not met her burden to show that Crawford "demonstrated the medical knowledge of the standard of care and what she needs to do to demonstrate that." The trial court stated that "she's not qualified as an expert witness regarding the standard of care of nursing in the nursing home setting; RN, LPN, and CNA." The trial court specifically noted Crawford's concession that the way she initially phrased her opinions regarding *C. diff.* orders violated Virginia and federal regulations. The trial court also concluded Crawford improperly "blended" the standard of care for physicians with that of the nursing staff.

After the trial court announced its ruling excluding Crawford as a witness, appellees moved for summary judgment based on Clements's lack of a standard of care expert. Clements conceded she could not prevail against appellees without a standard of care expert. The trial court therefore granted appellees' motion for summary judgment. Clements timely noted her appeal.

ANALYSIS

Clements advances two arguments on appeal: 1) the trial court erred in striking Crawford as a standard of care expert witness, and 2) the trial court erred in restricting the prospective testimony of Aponte and Schaubach to the medical records exchanged in discovery.

"A trial court's exercise of its discretion in determining whether to admit or exclude evidence will not be overturned on appeal absent evidence that the trial court abused that discretion." *Holt v. Chalmeta*, 295 Va. 22, 32 (2018) (quoting *May v. Caruso*, 264 Va. 358, 362 (2002)). "Though this Court 'generally review[s] evidentiary rulings under an abuse of discretion standard,' when the admissibility of testimony depends upon the interpretation of a statute, the question is one of law that we review de novo." *Our Lady of Peace, Inc. v. Morgan*, 297 Va. 832, 851 (2019) (alteration in original) (quoting *Jones v. Williams*, 280 Va. 635, 638 (2010)).

*I. The trial court erred in excluding Nurse Crawford as a standard of care expert witness.*

Clements argues that the trial court abused its discretion in striking Crawford's expert testimony. We agree.

*A. Clements's assignment of error regarding Crawford's admissibility is not procedurally defaulted.*

As an initial matter, appellees argue that this assignment of error was procedurally defaulted, as "Clements . . . failed to proffer Crawford's testimony in response to either the Court's ruling on MFA's motion to strike Crawford, MFA's motion for summary judgment, or Clements' motion to reconsider." Appellees focus exclusively on the fact that Clements filed two post-trial proffers as to what Crawford's testimony would have been, arguing in turn that these proffers were untimely. This argument fails as it ignores other parts of the record.

As Clements notes, regardless of whether the post-trial proffers were untimely, the pretrial record amply illustrates the intended testimony of Crawford, as evidenced by Clements's

expert designation.[8]  That designation makes clear that Crawford would be called to testify concerning: (1) her general nursing knowledge regarding nursing care administered in nursing homes; (2) her general knowledge in wound care; (3) her specific knowledge in caring for nursing home patients who need to be turned and repositioned due to their health issues; (4) her specific knowledge about following orders and instructions from physicians regarding lab testing; and (5) her specific knowledge about administering nursing care for patients diagnosed with *C. diff*.  Further, her testimony at trial illustrated this knowledge, and what she intended to testify to as an expert witness as well.

"Error may not be predicated upon . . . exclusion of evidence, unless . . . the substance of the evidence was made known to the court."  Va. R. Evid. 2:103.  "[I]t shall be sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objections to the action of the court and his grounds therefor."  Code § 8.01-384(A).  "[T]hese principles require the proffer of at least a summary of the witness' expected testimony, sufficient to establish its relevance, contemporaneous with the court's considering its ruling whether to admit or exclude it." *Creamer v. Commonwealth*, 64 Va. App. 185, 199 (2015).

> The rationale supporting this requirement is clear.  Busy trial courts should not be required to repeat trials . . . because the trial judge has excluded evidence for lack of a clear understanding of the proponent's purpose in offering the evidence.  The trial judge must be put on notice of the purpose for which the evidence is offered while there is still time to remedy the situation.

*Id.* at 200-01 (alteration in original) (quoting *Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1421 (5th Cir. 1986)).  The record here—including both the expert designation of Crawford and her trial testimony—is quite clear as to what her testimony would be, and the trial

---

[8] Appellees do not challenge the timeliness of Clements's expert designation pertaining to Crawford.

court had the opportunity to fully understand what Crawford's testimony would be, and to rule on its admissibility. Therefore, Clements's assignment of error on this issue is not procedurally barred.

*B. Nurse Crawford satisfied the statutory requirements to qualify as an expert standard of care witness.*

We next turn to the merits of the issue. Code § 8.01-581.20 governs the admissibility and qualification of expert witnesses in medical negligence cases. Code § 8.01-581.20(A) provides that "[a]ny health care provider who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field of practice in which he is qualified and certified." Further,

> [a]n expert witness who is familiar with the statewide standard of care shall not have his testimony excluded on the ground that he does not practice in this Commonwealth. A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

Code § 8.01-581.20(A).

"The question whether a witness is qualified to testify as an expert is 'largely within the sound discretion of the trial court.'" *Perdieu v. Blackstone Fam. Prac. Ctr.*, 264 Va. 408, 418 (2002) (quoting *Noll v. Rahal*, 219 Va. 795, 800 (1979)). However, "in an action alleging medical malpractice, we will overturn a trial court's exclusion of a proffered expert opinion 'when it appears clearly that the witness was qualified.'" *Holt*, 295 Va. at 32 (quoting *Perdieu*, 264 Va. at 418).

Here, Crawford testified that she was licensed as a registered nurse in Virginia during the relevant time period. Therefore, the presumption contained in Code § 8.01-581.20(A) applies,

and it is "presumed that [Crawford] knew the statewide standard of care in [her] specialties."

*Jackson v. Qureshi*, 277 Va. 114, 122 (2009). However, this presumption is a rebuttable one.

> Even with the benefit of the presumption, "to qualify as an expert witness on the standard of care, the witness must have expert knowledge on the standard of care in the defendant's specialty and an 'active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.'"

*Id.* (quoting *Lloyd v. Kime*, 275 Va. 98, 109 (2008)). These two requirements are referred to "as

the 'knowledge' requirement and the 'active clinical practice' requirement." *Id.* (quoting *Wright*

*v. Kaye*, 267 Va. 510, 518 (2004)). In evaluating whether a particular witness satisfied the

"knowledge" requirement and the "active clinical practice" requirement, we look to the "relevant

medical procedure[s] at issue." *Id.* at 123. Here, Clements alleged two acts of negligence: (1)

the nursing staff failed to turn and reposition Hodnett, and (2) the nursing staff failed to take

steps that would have led to the timely diagnosis of Hodnett's *C. diff.*, including the failure to

administer a test for *C. diff.* after receiving an order to do so.[9] Therefore, we ask: (1) whether

_____

[9] Appellees argue on brief that Clements's complaint did not contain an allegation regarding the failure to comply with an order to test for *C. diff.* Specifically, appellees argue that "the [c]omplaint contained no allegations about the alleged 'order to test Hodnett for *C. diff.*' or MFA's alleged failure to treat the infection. The [c]omplaint alleged only that MFA 'failed to timely diagnose' Hodnett's *C. diff.* infection." This argument fails for two reasons. First, to the extent that appellees argue that the complaint was insufficient to place appellees on notice of the nature of Clements's claim, Rule 3:18 makes clear that Virginia plaintiffs are not required to specifically plead the detailed factual allegations which make up the grounds for a claim of negligence. *See* Rule 3:18(b) ("An allegation of negligence or contributory negligence is sufficient without specifying the particulars of the negligence."). Here, Clements's broad allegation that appellees "failed to timely diagnose" Hodnett's *C. diff.* is sufficient to encapsulate the narrower contention that that failure was due, in part, to the nursing staff's failure to secure a lab test for *C. diff.* based on the physician's order to do so. Second, the record is clear on this point, as counsel for Clements asserted at trial:

> I would proffer to the court, we are not in this claiming the nurses at the nursing home should have advanced a laboratory test without a physician's order. The testimony in this case is that there was a physician's order for a lab test and the nursing home didn't carry it out.

- 16 -

Crawford knew the standard of care for a nurse regarding each of these situations, (2) whether she knew "what conduct conforms or fails to conform to those standards," and (3) whether she had an "active clinical practice in either the [nursing staff's] specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action." *Perdieu*, 264 Va. at 419.

### i. Nurse Crawford satisfied the "knowledge" requirement.

"With regard to the 'knowledge' requirement, [Clements], as the proponent of the expert witness, had the initial burden to 'show, among other things, that the "specialty or field of medicine in which [Crawford was] . . . certified" [was] the same as [the nursing staff's] specialty or a related field of medicine.'" *Jackson*, 277 Va. at 122 (quoting *Lloyd*, 275 Va. at 109). There can be no question that Crawford, as a licensed registered nurse, was certified in the same field as the nursing staff. Therefore, Crawford was entitled to the presumption that she knew the relevant standard of care. *See id.*

Appellees sought to rebut that presumption of knowledge, but they did not meet their burden. Crawford specifically testified that she had been employed for more than 20 years as a nurse or nurse practitioner working in nursing homes. She also testified that even when employed as a nurse practitioner during the relevant time period, part of her duties required her to undertake the duties of a nurse. She testified to the standard of care expected of such nurses, stating that for nursing home patients in Hodnett's condition, the standard of care would require the nursing staff to continuously turn and reposition Hodnett every two hours while in bed, and every hour when seated in a chair. Crawford testified that this standard was important to adequately prevent and treat pressure sores. Crawford also testified that the standard of care regarding lab testing would require the nursing staff, upon receiving a physician's order, to facilitate such testing by obtaining a culture or specimen and sending it to the lab to be tested.

- 17 -

This uncontradicted testimony demonstrated that Crawford had knowledge of the relevant standards of care for the nursing staff. A court cannot disregard uncontradicted testimony from a standard-of-care expert that the standards at issue between two different but related disciplines are common to both. *See Sami v. Varn*, 260 Va. 280, 284 (2000) ("[T]he trial court was not entitled to ignore the uncontradicted testimony that the standard of care for the performance of pelvic examinations was common to both specialties." (citing *Cheatham v. Gregory*, 227 Va. 1, 4 (1984))).

To the extent that appellees argue that Crawford was testifying as to the standard of care for a *nurse practitioner*, that argument is belied by Crawford's testimony, as laid out above. She specifically stated that she was testifying to the standard of care for nursing home nurses. Further, Crawford testified that the standards she had testified to regarding turning and repositioning a patient, as well as following the orders of a doctor, were in fact the same for all nurses, including "LPNs, RNs, and any level of graduate RN."[10] Therefore, the trial court's findings that Crawford did not demonstrate the requisite knowledge of the applicable standards of care for nursing home nurses and that she further impermissibly "blended" the applicable standards of care of registered nurses and nurse practitioners, were error.

Appellees also point to Clements's expert designation, as well as Crawford's testimony regarding how nurses facilitate lab testing, claiming that Crawford purportedly advocated for the violation of federal and Virginia law. Specifically, appellees argue that Clements's expert designation contained a proffer that Crawford would testify that, notwithstanding the fact that the order to test for *C. diff.* was not written until January of 2014, the nursing staff was still required to collect a stool sample and send it to a lab to be tested for *C. diff.* as early as October 2013.

---

[10] Based on the context, in referring to "any level of graduate RN," Crawford was clearly referring to graduate-level credentialed nurses, such as nurse practitioners.

Moreover, appellees contend that Crawford testified to as much, both during her deposition and at trial. Appellees' contentions on this point are belied by the record.

First, with regard to Clements's expert designation, appellees mischaracterize the relevant language from that filing. Those designations were substantial in scope. Subsection I detailed the general factual background that led up to Hodnett's passing and the specific facts that gave rise to the claims of medical negligence asserted by Hodnett's estate against *both* DRMC *and* appellees. Subsection II clarified certain allegations pertaining to those claims and specified the theories of negligence Hodnett's estate was asserting against each defendant. Finally, Subsection III designated multiple experts—both nurses and physicians[11]—that Clements anticipated would testify for her case-in-chief.

At various points throughout the designation, Clements noted the issues arising from appellees' care of Hodnett, generally. These included issues related to the failure to turn and reposition Hodnett, as well as the failure to timely diagnose Hodnett's *C. diff.* infection. As relevant to the failure to diagnose Hodnett's *C. diff.*, on page six of Clements's expert designation, Clements noted that starting as early as October 18, 2013, Hodnett exhibited symptoms consistent with a high risk of *C. diff.* On page seven, Clements asserted that "Gretna failed during the second Gretna admission to recognize the importance of Hodnett's high/increased *C. diff* risk, frequent diarrhea, and *C. diff.* symptoms and failed to ensure he was tested and treated for *C. diff.*" On pages 10 and 11, Clements asserted that on [November 21, 2013], Hodnett's treating physician "received a call from 'Molly' at Gretna, who reported that Hodnett . . . just got cleared of *C. diff.*" Hodnett continued to exhibit symptoms that were

---

[11] Two of the physician experts designated by Clements included James A. Avery, "an internal medicine physician with geriatric subspecialty licensed in the Commonwealth of Virginia," and Thomas Carrico, "a surgeon licensed in the Commonwealth of Virginia, [who] treated Hodnett at Centra's Wound Care Center." Both were designated as potential standard of care experts for Clements's case.

consistent with a high risk for *C. diff.* between November 2013 and January 2014, and the expert

designation asserts that "Hodnett had not previously received any *C. diff.* treatment." Further,

"on [January 27, 2014], Hodnett's physician ordered Gretna to collect and have tested a 'stool

sample for *C. diff.*' Gretna did not properly transcribe the order into Hodnett's records. . . .

Gretna . . . requested in error from Centra Lab a mere stool culture, not *C. diff.* toxin testing."

According to Clements, these failures resulted in the delayed diagnosis of Hodnett's *C. diff.*, and

Hodnett was only finally diagnosed with *C. diff.* on March 9, 2014, when he was transported to a

different medical facility.

Subsection II of the expert designations spelled out the allegations of negligence against

both "Gretna" (appellees), and DRMC (since released as a defendant). That section noted

various ways in which Gretna as an institution was negligent, *and also specified the negligent*

*conduct of Gretna's nursing staff, in particular.* On pages 14-16 of the designations, Clements

asserted that:

> Gretna was negligent and violated applicable standards of care . . .
> by failing to obtain *C. diff* testing for Hodnett beginning [October
> 18, 2013] so Hodnett's *C. diff.* could be timely diagnosed and
> treated. Hodnett's frequent near-daily episodes of diarrhea, in
> addition to the administration of antibiotics, PPIs, narcotics, and
> antiperistaltics, should have prompted Gretna to request and
> receive *C. diff.* testing for Hodnett on and after [October 18, 2013].

Moreover, Clements asserted on pages 14-16 that:

> Gretna should also immediately have complied with the [January
> 27, 2014] order from Hodnett's physician for Gretna to collect and
> have tested a "stool sample for *C. diff.*" and, if such testing was not
> immediately performed, advised Hodnett's attending physician
> from [January 27, 2014] until [March 7, 2014], when Hodnett was
> admitted to [another medical facility] and tested positive for *C.
> diff.*, that he had not been tested for *C. diff.* as ordered.

Finally, Clements alleged on page 16 of the designations that "Gretna's own Weight Committee

on [January 29, 2014] advised it thought Hodnett had been 'admitted with . . . *C. diff.* w/loose

stool' but knew he had not been tested, diagnosed, or treated for *C. diff.* at Gretna." Clements alleged that "Gretna's failure timely to test and confirm Hodnett's *C. diff.* prevented him from receiving Flagyl and vancomycin when he should have to treat the *C. diff* and resulted in treatment delays that permitted Hodnett to suffer abdominal pain, profuse diarrhea, fever, mucous in his stool, fulminant *C. diff.* infection, SIRS/sepsis, and death."

Subsection III, thereafter, designated multiple experts as potential expert witnesses— including both nurses and physicians—who would testify at trial. The individual designations for these various proffered experts were uniquely tailored to each medical professional. Each designation referenced and incorporated different parts of the prior two subsections. And each designation laid out the expected testimony of the particular witness, their medical knowledge and opinions, and how the prior-referenced facts applied to those medical opinions. Among those experts was Crawford.

In designating Crawford as a standard of care expert, Clements noted that Crawford would testify that "Gretna was negligent for the reasons discussed" in Subsection II. Appellees seize on this language to support their contention that Crawford intended to testify that the *nursing staff* should have collected a stool sample and had that sample sent to a lab to be tested for *C. diff. without a physician's order* to do so. This is a mischaracterization of the expert designation.

The expert designation, as noted above, contained a multitude of factual allegations that gave rise to multiple claims against multiple defendants and their agents or employees. The assertions contained on pages 10 and 11 of the expert designation are broad allegations of the *facility's* negligence, not the nursing staff specifically. In speaking to the alleged negligence of the *nursing staff* specifically, Crawford's expert designation clarified that:

> To the extent Gretna claims Hodnett's physician or physician
> extender did not order/instruct for Hodnett to receive the care

- 21 -

Crawford is designated to testify Hodnett needed pursuant to applicable nursing home standards of care and that, therefore, Gretna was not able in the absence of such an order/instruction to provide that care, Crawford will testify Gretna should have communicated and partnered with Hodnett's physician or physician extender and, if necessary, invoked the "chain of command" process in place at Gretna to ensure Hodnett received the care he needed and, if an order was necessary before that care could be provided, obtain an order directing Gretna to provide that care.

The expert designation therefore makes clear exactly what Crawford's proffered testimony would be on this point: 1) Appellees failed to timely diagnose Hodnett with *C. diff.*, pursuant to applicable standards of care; 2) This failure stemmed from the nursing staff's failure to follow the January 2014 order to test for *C. diff.*; and 3) Moreover, based on the symptoms that Hodnett exhibited beginning on October 18, 2013, the nursing staff was required to "communicate[ or] partner[] with Hodnett's physician or physician extender" to facilitate such testing and diagnosis earlier than January of 2014.[12] Nowhere in the expert designation does Clements proffer that Crawford would testify that the nursing staff should have conducted the *C. diff.* lab testing sans order. Therefore, the proffered testimony appropriately lays out a viable medical negligence case and does not violate federal or Virginia regulations on point.

Second, with regard to Crawford's initial testimony pertaining to the applicable standard of care regarding *C. diff.* testing, appellees simply take Crawford's words out of context. In an effort to impeach Crawford, counsel for appellees questioned Crawford about her understanding

---

[12] Clements intended to support this contention with expert testimony from qualified physicians, who would have testified to a medical degree of certainty that "if Hodnett had been tested for *C. diff.* from [October 18, 2013] through early March 2014 (when he tested positive for *C. diff.* at LGH), the test results, given his diarrhea and the constellation of other *C. diff.* symptoms, would, to a high degree of probability, have been *C. diff* positive." (*See* Plaintiff's Designation of Expert Witnesses at 21, R. 986). Further, Clements intended to elicit testimony from medical experts that this failure "deprived Hodnett of receiving timely treatment [of] Flagyl and vancomycin, which would have been effective at preventing, reversing, and eliminating Hodnett's *C. diff.* infection." (*See id.*, R. 985).

of the ability of nursing teams to order lab testing for certain infections notwithstanding the fact that a physician had not ordered a test for a particular infection. Crawford initially seemingly indicated that a nursing team would have that authority. As counsel pointed out to Crawford on cross-examination—and as appellees point out now on appeal—such a practice would violate federal law. *See* 42 C.F.R. § 483.30 (Physician services); 42 C.F.R. § 483.35 (Nursing services); 42 C.F.R. § 83.40(e)(iii)(2); 42 C.F.R. § 483.75. Appellees argue that by impeaching Crawford on this point, her testimony regarding her knowledge of the standard of care was not consistent, was not "uncontradicted," and therefore the presumption contained in Code § 8.01-581.20(A) was rebutted.

Again, the record belies appellees' contentions on this point. After counsel for appellees asked her a follow-up question she clarified her answer, correcting herself, and demonstrating her knowledge of the relevant standard of care, i.e., that a physician's order was necessary in order for a nursing team to carry out lab testing. Crawford stated:

> [I]t's critical because the patient is very, very sick, it's critical to send it off, get the doctor's order *at that time*. It all has to work together. *It can't just be collect an order [sic] and send it off without a physician's order*. You need to all work together as a team.

(Emphasis added). Crawford then confirmed that it would violate federal and Virginia regulations to send a sample to a lab to be tested without an order from a physician. When asked by counsel for appellees whether she had just admitted "that what [she] just testified to violates Virginia and federal regs," Crawford responded "No. What I said was you have to work as a team. You have to all work together so it's all done at the same time *so nothing gets tested without a doctor's order*." (Emphasis added). This testimony is in accord with Crawford's expert designation; and as we concluded above, such testimony is permissible. Therefore, the

- 23 -

record is clear that Crawford testified that a physician's order is required before the nursing team may send a sample to a lab to be tested.

The trial court failed to give appropriate weight to the statutory presumption regarding Crawford's knowledge of the standard of care as the evidence offered by appellees was insufficient to rebut the legal inference that Crawford's licensure afforded her. Therefore, the trial court erred in ruling that she had not demonstrated the requisite knowledge of the applicable standard of care.

*ii. Nurse Crawford satisfied the "active clinical practice" requirement.*

We next turn to the "active clinical practice" requirement. "To qualify as an expert, [Crawford] needed an 'active clinical practice in either [the nursing staff's] specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.'" *Jackson*, 277 Va. at 124 (quoting *Sami*, 260 Va. at 283). Code § 8.01-581.20 exists "to prevent testimony by an individual who has not recently engaged in the actual performance of the procedures at issue in a case"—those by which the defendant allegedly deviated from the standard of care. *Wright*, 267 Va. at 523 (quoting *Sami*, 260 Va. at 285). In applying the "active clinical practice" requirement, the Supreme Court has stated that "it is sufficient if in the expert witness' clinical practice the expert *performs the procedure at issue and the standard of care for performing the procedures is the same*." *Id.* (emphasis added) (quoting *Sami*, 260 Va. at 285). Whether an expert has actually performed the procedures at issue is "not to be given a narrow construction inconsistent with the plain terms of the statute." *Id.* at 524.

Here, Crawford testified that she had actually performed the procedures at issue during the relevant time period. She testified that she had turned and repositioned patients during her time working at Seaside. Further, she noted that, though she was technically employed as a nurse practitioner, part of her daily work regimen required that she engaged in administering

medical care akin to that of a registered nurse. Crawford also testified that she "complete[d] the requests form for *C. diff.* testing to be sent to a lab" and that she was "familiar with the concept within the nursing home of verbal orders and written orders and issuing and following those [orders]." Crawford testified that in her experience, she would "review the orders, and many times the doctors would call [her] and give [her] verbal orders to complete." She "would collect [the stool], if the stool was available. If not . . . [she] would talk to the nurses, instruct the nurse that was caring for that patient how to do that to make sure it was carried out properly." Crawford's uncontradicted testimony on this point is clear; she engaged in the medical procedures at issue in this case. That is sufficient, as a matter of law, to satisfy the "active clinical practice" requirement.

Appellees, in urging us to affirm, point to the fact that Crawford was employed as a nurse practitioner, not a nurse, during the relevant time period. With regard to Crawford's employment, while it is true that Crawford confirmed that she was employed as a nurse practitioner during the relevant time period, that fact is not dispositive of our analysis.[13] As noted above, Crawford testified that her duties of care in providing patient care during this time included elements of *both* a nurse and a nurse practitioner. The fact that part of her care for

---

[13] A threshold question exists as to whether the professions of a registered nurse and a nurse practitioner are even so different as to require an analysis of their overlap. For instance, while appellees argue that a nurse practitioner is different *in kind* than a nurse, in that a nurse practitioner is part of the "medical team" as opposed to the "nursing team," Clements argues that a nurse practitioner, by necessity, is a *nurse*, and therefore the two cannot be different in kind. We need not address this potential issue, however, as the record in this particular case makes clear that Crawford undertook duties of *both* a nurse and a nurse practitioner. This allows us to decide the case on the narrow ground that her *nursing practice*—not her nurse practitioner practice—satisfied the mandates of Code § 8.01-581.20. *See Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("As we have often said, 'the doctrine of judicial restraint dictates that we decide cases "on the best and narrowest grounds available."'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))); *Appalachian Power Co. v. State Corp. Comm'n*, 301 Va. 257, 292 (2020) (refusing to address an additional argument given that the Court's ruling on another issue "moot[ed]" that argument (citing *White*, 293 Va. at 419)).

patients involved her acting as a nurse practitioner does not negate the fact that another part of her experience involved her acting as a nurse. In testifying that part of her duties included that of a nurse and that the standard of care she testified to was applicable to both nurses and nurse practitioners alike, the requirements of Code § 8.01-581.20 were met.

Therefore, the trial court erred in excluding Crawford as a standard of care expert witness.

## II. *The trial court properly limited the testimony of Aponte and Schaubach.*

Having determined that the trial court erred in disqualifying Crawford as an expert witness, we next turn to the issue regarding Aponte and Schaubach's testimony. Upon review of the record, it is clear that the trial court's decision to restrict Aponte and Schaubach's testimony arose from a discovery issue, and fell firmly within the trial court's discretion. We see no abuse of that discretion, and therefore affirm the trial court's ruling pertaining to that determination.

After a hearing held on November 29, 2021, the trial court entered an order on February 10, 2022, limiting the testimony of Aponte and Schaubach "to what is in the medical records they prepared and that were exchanged in discovery concerning Fred Hodnett's care and treatment." Further, the trial court noted in a different order entered that same day that the discovery period in the case had closed, but that each party had a duty to "seasonably supplement and amend discovery responses pursuant to Rule 4:1(e)." Clements does not challenge either of these two decisions on appeal, and they are therefore the law of the case.

Clements thereafter filed what purported to be "supplemental discovery responses" in July of 2022, proffering certain facts that Aponte and Schaubach would testify to. The trial court determined Clements's supplemental disclosures for Aponte and Schaubach were actually untimely designations of expert testimony under its initial scheduling order and beyond the scope of permissible testimony as set forth in its February 10, 2022 order. Further, the trial court noted

that *even if* the supplemental disclosures were simply responses to appellees' discovery interrogatories regarding certain fact witnesses that Clements anticipated calling in her case-in-chief, those responses would *also* have come too late, per the February 10, 2022 order, as they purported to expand the universe of facts that Aponte and Schaubach would testify to.

Our review of the supplemental responses reveals that they indeed contain factual matters that Aponte and Schaubach would testify to, as well as their purported expert opinions. Notwithstanding the latter, Clements concedes on appeal that the supplemental responses were intended to be responsive to appellees' discovery interrogatories. To the extent that the supplemental responses could be viewed as purported expert designations, Clements agrees that any such expert designations would be untimely.

As to the question of whether these supplemental responses impermissibly expanded the universe of facts to which Aponte and Schaubach could testify beyond the scope of the trial court's February 10, 2022 order, we see no error in the trial court's judgment. The trial court rightly noted that discovery in this case had closed and that Clements was cabined to the discovery responses she had already provided—i.e., the medical notes.

Pursuant to the February 10, 2022 order, Aponte and Schaubach were restricted to testifying about the medical notes each had prepared concerning Hodnett's treatment. This was because, in responding to appellees' discovery interrogatories, Clements, in disclosing Aponte and Schaubach as potential fact witnesses, chose to assert that each would only testify to the factual universe related to the medical notes they each signed, respectively. To the extent that these supplemental responses *expanded* that universe of facts to which Aponte and Schaubach would testify, the trial court barred any such testimony. In effect, this ruling was akin to a discovery sanction under Rule 4:12. "Rule 4:12(b) governs discovery abuses and provides for

sanctions against a party who fails to comply with a court's order to provide or permit discovery." *Walsh v. Bennett*, 260 Va. 171, 175 (2000). Rule 4:12(b)(2)(B) provides:

> If a party . . . fails to obey an order to provide or permit discovery, . . . the [trial] court . . . may make such orders in regard to the failure as are just, [including] . . . *refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence*.

(Emphasis added). Further, subsection (a)(3) of that Rule provides that "[f]or purposes of this subdivision an evasive or incomplete answer is to be treated as a failure to answer."

"A trial court generally exercises 'broad discretion' in determining the appropriate sanction for failure to comply with an order relating to discovery." *Walsh*, 260 Va. at 175 (quoting *Woodbury v. Courtney*, 239 Va. 651, 654 (1990)). "Consequently, we accord deference to the decision of the trial court in this case and will reverse that decision only if the court abused its discretion in" restricting the testimony of Aponte and Schaubach to the substance of the medical records exchanged in discovery. *Id.* (citing *First Charter Land Corp. v. Middle Atl. Dredging, Inc.*, 218 Va. 304, 308-09 (1977)).

Here, Clements's initial response to appellees' interrogatories was incomplete, in that Clements only indicated that Aponte and Schaubach would testify to factual matters contained within the medical records. After those initial responses, discovery in this case closed. Then, after discovery closed, Clements filed what purported to be "supplemental responses" to appellees' discovery interrogatories. The trial court correctly identified the purported "supplemental responses" as either an untimely expert designation, or a backdoor effort to enlarge the factual universe to which Aponte and Schaubach could testify. And in fact, on appeal, Clements concedes that the supplemental responses "outline the two witnesses' knowledge of matters outside the medical record[s]." The trial court, in its discretion, disallowed any such testimony to the extent that it enlarged that factual universe. Importantly, the trial court

- 28 -

did not strike Aponte and Schaubach altogether; instead, it simply reaffirmed its earlier ruling cabining their proffered testimony to what was contained in their respective medical notes. Further, the trial court expressly noted that this restriction applied only to Clements's case-in-chief; the trial court left open the possibility that the subject matter identified in the untimely supplemental responses might be appropriate testimony in rebuttal, depending on the evidence appellees put on in their defense. The trial court did not err in interpreting the contours of its prior two orders,[14] nor was it an abuse of discretion for the trial court to cabin the testimony of Aponte and Schaubach to conform with its prior order.

In a last-ditch effort, Clements argues that while she identified Aponte and Schaubach as potential fact witnesses in this matter, she "did not have information about their anticipated knowledge beyond that contained in the medical records that they prepared about the patient." She further states that appellees' "disclosures of [their] own experts 60 days before the 2021 trial date first alerted the administrator to the prospect of these witnesses' knowledge." Clements cites the trial court's initial pretrial scheduling order, presumably for the proposition that she was reasonably diligent in making discovery in this case and that she provided the additional supplemental responses "as soon as practical" once apprised of the defense strategy.

We note that, indeed, Clements's initial responses to appellees' interrogatories did not list Aponte and Schaubach as potential fact witnesses, but that her first supplemental responses, filed shortly before the trial date, on November 4, 2021, did. Nevertheless, even if Clements was only alerted to the necessity of expanding the scope of expected testimony of Aponte and Schaubach after appellees' own discovery disclosures, and even if that lack of awareness was reasonable,

_____

[14] "[T]rial courts have the authority to interpret their own orders." *Fredericksburg Constr. Co. v. J.W. Wyne Excavating, Inc.*, 260 Va. 137, 144 (2000) (*citing Rusty's Welding Serv., Inc. v. Gibson*, 29 Va. App. 119, 129 (1999)). "Furthermore, when construing a lower court's order, a reviewing court should give deference to the interpretation adopted by the lower court." *Id.* (quoting *Rusty's Welding Serv., Inc.*, 29 Va. App. at 129).

Clements still did not provide any additional responses for another eight months, until July of 2022. The only explanations provided by Clements for that delay were that: 1) Schaubach, "moved her residence twice during the pendency of this case, from Lynchburg to Chesapeake and then to North Carolina"; and 2) although Aponte was still in the area, contact was only possible through his staff. The trial court was within its discretion to determine that Clements was not diligent in seeking to supplement her discovery responses. *See Dennis v. Jones*, 240 Va. 12, 19 (1990) (defining diligence as a "devoted and painstaking application to accomplish an undertaking"). The trial court therefore did not abuse its discretion in restricting the testimony of Aponte and Schaubach.

In reaching this conclusion, however, we find it necessary to clarify the contours of the trial court's holding, as well as our own on this point. In affirming the trial court on this point, we agree that Aponte and Schaubach may not testify as expert witnesses. However, the Supreme Court has distinguished between expert medical testimony that may be testified to by qualified expert witnesses, and factual medical testimony that a treating provider may testify to. *See Smith v. Irving*, 268 Va. 496, 502 (2004) (holding that a doctor's "actions he took and his reasons for taking those actions[, as well as] [h]is testimony regarding what 'many surgeons . . . do' . . . was factual in nature and did not constitute expert testimony" (third alteration in original)); *see also Turner v. Duke Univ.*, 381 S.E.2d 706, 716 (N.C. 1989) (when a plaintiff's treating physician testifies not about the standard of care but about his treatment of the plaintiff and his decision to recommend surgical options, he is providing factual, not opinion, testimony), cited to approvingly in *Toraish v. Lee*, 293 Va. 262, 273 (2017); *Pettus v. Gottfried*, 269 Va. 69, 77-78 (2005) (holding that a doctor's testimony that a patient's "mental disorientation 'could have been' a central nervous system event . . . was factual in nature because it served to explain the impressions and conclusions he reached while treating" the patient). To the extent that Aponte

- 30 -

and Schaubach would testify to their treatment of Hodnett, the actions they took, their reasons for taking such actions, and their understanding of what other treating providers typically do in those situations, such testimony would be factual in nature, and would therefore be admissible, *so long as it also falls within the scope of the aforementioned medical records*. We recognize that differentiating between what factual subjects are permissible, pursuant to the trial court's prior order, and which topics are inadmissible pursuant to that order, is a fact-intensive exercise which will require the discerning exercise of a court's discretion in parsing such proffered testimony. We believe this exercise is best undertaken by the trial court. To that end, we remand to the trial court to undertake that exercise during Aponte and Schaubach's testimony.

## CONCLUSION

The trial court erred in excluding Crawford's expert testimony on the standard of care owed to Hodnett. Because the trial court's decision to grant appellees' motion for summary judgment was based on its decision to strike Clements's standard of care expert, that decision was also error. The trial court did not, however, abuse its discretion in restricting the testimony of Aponte and Schaubach. The trial court's rulings are therefore affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

Causey, J., concurring in part, and dissenting in part.

I concur with the majority that the trial court did not abuse its discretion in restricting the testimony of Aponte and Schaubach. However, even with the benefit of the presumption afforded to Crawford in Code § 8.01-581.20(A), she failed to demonstrate knowledge of the standard of care owed to Hodnett by the nursing team. Therefore, I would affirm the trial court's decision to strike Crawford as a standard of care expert and grant appellees' motion for summary judgment based on this decision. I respectfully dissent.

Our Supreme Court has instructed that

> [e]ven with the benefit of the presumption, "to qualify as an expert witness on the standard of care, the witness must have expert knowledge on the standard of care in the defendant's specialty and an 'active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.'"

*Jackson v. Qureshi*, 277 Va. 114, 122 (2009). "'[A] witness shall be qualified to testify as an expert' if *both* statutory requisites are met." *Wright v. Kaye*, 267 Va. 510, 518 (2004) (emphasis added). Crawford must have expert knowledge of a nurse. "[I]n an action alleging medical malpractice, we will overturn a trial court's exclusion of a proffered expert opinion 'when it appears clearly that the witness was qualified.'" *Holt v. Chalmeta*, 295 Va. 22, 32 (2018) (quoting *Perdieu v. Blackstone Fam. Prac. Ctr.*, 264 Va. 408, 418 (2002)). Based on a review of the record, appellant failed to show that Crawford was clearly qualified as an expert in the nursing standard of care, and the trial court's decision to exclude her was not in error.

Here, the trial court reasonably doubted Crawford's knowledge. Although Crawford was a dual-licensed nurse practitioner and registered nurse, she was called as an expert to testify on the standard of care required of the nursing staff. The trial court cited two reasons for doubting Crawford's knowledge. First, the court noted that Crawford conflated the standard of care

between a nurse practitioner and a nurse when she mistakenly relied on a federal regulation that was a violation of a Virginia regulation.  Second, the trial court noted that

> the concern of the Court is when asked about the standard of care, [Crawford] said, Well, we are all one team.  It's two separate teams.  It's a different standard of care for a physician team versus nursing team.  She said it several times.  I noted it during her testimony.  That is not the standard of care.  She's not been able to demonstrate that she can testify separately as to the physician team that is required of the federal regulations for a nursing home on the standard of care versus the nursing team for the nursing care for the nursing home.  Taking a look at that, her knowledge, she's not been able to -- to the contrary, she's blending both of the standards of care into one.

The distinction between the physician team and the nursing team is a critical one.  The Virginia Administrative Code outlines that nursing home residents receive care from two distinct groups of providers: a physician team consisting of a physician or a combination of physician, physician's assistant, or nurse practitioner; and a nursing team consisting of registered nurses ("RN"), licensed practical nurses ("LPN"), and certified nursing aides ("CNA").  *See* 12 VAC 5-371-240; 12 VAC 5-371-210.  The physician team is responsible for creating a "medical plan of care," which includes identification of resident problems, orders for medications, treatments, restorative services, diets, and other special procedures.  12 VAC 5-371-240(C).  The nurse team is responsible for implementing the "medical plan of care" through such services as administration of medication and treatments and other services intended to prevent "clinically avoidable complications."  12 VAC 5-371-220(B),(C).  Thus, the responsibilities, and the standard of care required, differ between the two teams.

Nurse practitioners, such as Nurse Crawford, may diagnose, treat, and prescribe just like a physician.  By contrast, LPNs may perform only certain acts in the care of individuals under the direction or supervision of a licensed medical practitioner, RN, or another authorized licensed health professional.  Code § 54.1-3000.  RNs may perform only certain acts in the

observation, care, and counsel of individuals and administer medications and treatments as prescribed by a person authorized by law to prescribe medications and treatment. *Id*. Thus, a nurse practitioner, under the law, is a much different healthcare provider than an RN or LPN and the standards of care for each are also different. Nurse Crawford was called as an expert witness regarding the standard of care of nursing in the nursing home setting.

As the proponent of the expert witness, Clements had the initial burden to demonstrate Crawford's knowledge by showing "that the standard of care, as it relates to the alleged negligent act or treatment, is the same for the proffered expert's specialty as it is for the defendant [nurse's] specialty." *Jackson*, 277 Va. at 122. Contrary to the majority's position, the trial court did not "disregard Crawford's uncontracted testimony" regarding the nursing standard of care. Rather, it is clear from the record that the trial court considered the totality of Crawford's testimony and found that by repeatedly testifying that the standard of care was the same for both the physician and nursing team, her testimony called in to question the sufficiency of her knowledge to the requisite standard of care.[15] Thus, appellant failed to carry its burden to show Crawford's expert knowledge in nursing. Therefore, it was not error for the trial court to find that because of Crawford's repeated testimony that the physicians' team and the nursing team were all one team, she lacked the requisite knowledge to testify to the nursing standard of expert care in this case.

"The fact that a witness is an expert in one field does not make him an expert in another field, even though the two fields are closely related." *Combs v. Norfolk & W. Ry.*, 256 Va. 490, 496 (1998). When looking back over the evidence and the record, the trial court correctly

---

[15] The trial court explicitly noted that it was not considering "the deposition itself" in ruling on the appellees' motion but "it was the questioning from the deposition and it was testimony of Nurse Practitioner Crawford." "The Court only considered the portions [of the deposition] that were referenced during cross-examination of Ms. Crawford in its ruling."

determined that Crawford did not clearly demonstrate the requisite expert knowledge required for a nursing standard of care expert. Here, since the court doubted Crawford and found that she did not clearly demonstrate the requisite expert knowledge required for a nursing standard of care expert, the court did not find Crawford qualified. After careful review of the record and based on the evidence in the record, I find that Crawford clearly did not demonstrate the requisite knowledge, and thus she is not qualified. Additionally, we only "overturn a trial court's exclusion of a proffered expert opinion 'when it appears clearly that the witness was qualified.'" *See Holt*, 295 Va. at 32. Therefore, I would hold that the trial court's ruling striking Crawford as a standard-of-care expert should be affirmed.